## UNITED STATES v. EDWARDS.
### No. 866–Y.

District Court, S. D. California,
Central Division.

Sept. 8, 1936.

Peirson M. Hall, U. S. Atty., and Clyde Thomas, Deputy U. S. Atty., both of Los Angeles, Cal., for the United States.

E. V. Knauf, Harry J. McClean, Erwin H. Haas, all of Los Angeles, Cal., and Henry Wenzlaff, of San Bernardino, Cal., for defendant.

YANKWICH, District Judge.

The facts which lie at the foundation of the controversy are fully stated in the Opinion filed upon the interlocutory injunction on April 4, 1936, and reported in (D. C.) 14 F.Supp. 384. The matter is up now for final decision. Counsel have stipulated the facts substantially as set forth in the bill of complaint, which was summarized in the prior opinion. In effect, the government seeks to enjoin the defendant from handling oranges in California in violation of the order of January 26, 1936, of the

Secretary of Agriculture, establishing prorate districts and establishing the quantity of oranges for shipment in interstate commerce and into Canada from California and Arizona and the allotments to be shipped by shippers applying under the order. Under the stipulated facts, the only defense which the defendant now urges is that of unconstitutionality, pleaded in his answer. This defense reads: "That the said Agricultural Adjustment Act approved May 12, 1933, as amended on August 24, 1935, and all orders of the Secretary of Agriculture of the United States made pursuant thereto under which the plaintiff claims the right to restrict and prohibit the defendant from handling and shipping oranges and grapefruit produced in the States of California and Arizona in interstate and foreign commerce are unconstitutional in that the same contravene section 1 of article 1 and the Fifth and Tenth Amendments of the Constitution of the United States."

Extensive briefs have been filed by counsel in the matter.

■ They involve no principles which were not urged at the argument on the interlocutory injunction. The marketing provisions of the Agricultural Adjustment Act (7 U.S.C.A. § 601 et seq.) are still attacked as violative of due process guaranteed by the Fifth Amendment to the Constitution of the United States, and as an invasion of the reserved powers of the states, in violation of the Tenth Amendment to the Constitution. More specifically, the attack is that the marketing provisions of the act involve an unlawful delegation of legislative power and are a regulation of production of the type condemned in the most recent decisions of the Supreme Court. See U.S. v. Butler (1935) 297 U. S. 1, 56 S.Ct. 312, 80 L.Ed. 477, 102 A.L. R. 914; Panama Refining Company v. Ryan (1934) 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446; Schechter Poultry Corp. v. U. S. (1935) 295 U.S. 495, 55 S.Ct. 837, 79 L. Ed. 1570, 97 A.L.R. 947; Carter v. Carter Coal Company (1936) 56 S.Ct. 855, 80 L. Ed. 1160.

We have re-examined the conclusions declared in the opinion upon the interlocutory injunction in the light of the arguments now advanced. It would serve no useful purpose to restate these conclusions in detail and to answer the objections raised by counsel to their validity. Suffice it to say that a re-examination of the law

on the subject, in the light of the latest decisions of the Supreme Court, confirms the conclusion declared in the prior opinion that the marketing features of the Agricultural Adjustment Act are a proper exercise of the plenary power of the Congress to regulate interstate commerce. They are not a regulation of the production of the products, the shipment of which in interstate commerce they attempt to limit.

The opinions in Carter v. Carter Coal Company, supra, strengthen these views. The main opinion declines to deal with the question of the power to fix prices for commodities in interstate commerce. However, Mr. Chief Justice Hughes, in his concurring opinion, asserts distinctly the existence of such power as incidental to the plenary power of the Congress to regulate interstate commerce.

The dissenting opinion of Mr. Justice Cardozo, concurred in by Mr. Justice Brandeis and Mr. Justice Stone, recognizes that sales in interstate commerce are *clearly* interstate commerce. The following language of Mr. Chief Justice Hughes is significant: *"We are not at liberty to deny to the Congress, with respect to interstate commerce, a power commensurate with that enjoyed by the states in the regulation of their internal commerce.* See Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 79 L. Ed. 940, 89 A.L.R. 1469." Carter v. Carter Coal Co., supra, 56 S.Ct. 855, 876, 80 L.Ed. 1160. In Nebbia v. New York, supra, to which the Chief Justice referred, the power of the state to set up a minimum price for a commodity was sustained. In effect, the court there recognized it as within the power of a state to exercise such control in the matter of prices as would result in the abolition of "cut throat" competition and in the establishment of a code of "fair" competition. Can it then be said that the plenary power of the Congress to regulate commerce does not extend to the regulation of quantities of products to be sent in interstate commerce? The regulation of prices would have a much more direct bearing upon the production of goods than the regulation of the quantities to be shipped in interstate commerce. Such regulation would, according to ordinary economic principles, affect the entire price structure of the product, and would be felt not only by the portion of the product in interstate commerce, but also by the portion sold locally. It is an economic truism, that a stable price structure affects production.

Everywhere, and particularly in the United States, since the depression, the efforts towards economic recovery have been directed towards establishing a stable price structure that would encourage production and thus restore the unbalanced economic life. A regulation of prices must affect production directly. And yet such regulation is within the power to regulate commerce.

How, then, can it be said that the exercise of that power, when it aims to limit *the quantity* of products to be shipped in interstate commerce, is invalid, as involving control over production?

To deny to Congress its plenary power over commerce, merely upon the assumption that, in *some indirect way,* such control may induce persons to increase production voluntarily, would, if carried to its ultimate conclusion, cripple and destroy the power.

The marketing provisions of the Agricultural Adjustment Act are, in my opinion, a proper exercise of the power to regulate commerce. They are not an attempt to control production, of the type condemned in Schechter v. U. S., supra, and Carter v. Carter Coal Co., supra. Despite the admiration which I have for the distinguished District Judge of the District of Massachusetts, the Honorable Elisha H. Brewster, I cannot follow his conclusions, declared in the case of U. S. v. Buttrick Co. (1936) 15 F.Supp. 655, that these marketing provisions are an attempt or part of an attempt to control production.

My own conclusion is that they are not.

Nor do they involve any unlawful delegation of legislative power. We do not have in them the attempt given to persons constituting a portion of a group to control the conditions of production of others in the same group which the court condemned in Carter v. Carter Coal Co., supra.

Using the language of Mr. Chief Justice Hughes in Panama Refining Co. v. Ryan, supra, the marketing provisions of the Agricultural Adjustment Act *declare a policy* with respect to the subject, *set up* a standard for the delegate's action, and *require* findings by the delegate. As such, they involve only that authority or discretion as to the execution of the law or of the declared policy of the law which has always been recognized as valid.

Without it, the carrying into effect of many of the broadest constitutional powers of the Congress would, from a practical

standpoint, be rendered illusory. As said by Mr. Chief Justice Taft in Hampton, Jr., & Co. v. United States (1928) 276 U. S. 394, 48 S.Ct. 348, 351, 72 L.Ed. 624:

"The field of congress involves all and many varieties of legislative action, and congress has found it frequently necessary to use officers of the executive branch within defined limits, to *secure the exact effect intended by its acts of legislation,* by vesting discretion in such officers to make public regulations interpreting a statute and directing the details of its execution, even to the extent of providing for penalizing a breach of such regulations. United States v. Grimaud, 220 U.S. 506, 518, 31 S.Ct. 480, 55 L.Ed. 563; Union Bridge Co. v. United States, 204 U.S. 364, 27 S.Ct. 367, 51 L. Ed. 523; Buttfield v. Stranahan, 192 U.S. 470, 24 S.Ct. 349, 48 L.Ed. 525; In re Kollock, 165 U.S. 526, 17 S.Ct. 444, 41 L.Ed. 813; Oceanic Navigation Co. v. Stranahan, 214 U.S. 320, 321, 29 S.Ct. 671, 53 L.Ed. 1013.

"Congress may feel itself *unable conveniently to determine exactly when its exercise of the legislative power should become effective, because dependent on future conditions,* and it may leave the determination of such time to the decision of an executive, or, as often happens in matters of state legislation, it may be left to a popular vote of the residents of a district to be affected by the legislation. While in a sense one may say that such residents are exercising legislative power, it is not an exact statement, because *the power has already been exercised legislatively by the body vested with that power under the Constitution,* the condition of its legislation going into effect being made dependent by the Legislature on the expression of the voters of a certain district. As Judge Ranney of the Ohio Supreme Court in Cincinnati, Wilmington & Zanesville Railroad Co. v. Commissioners, 1 Ohio St. 77, 88, said 'in such a case:

" 'The true distinction, therefore, is, between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring an authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the latter no valid objection can be made.' See, also, Moers v. Reading, 21 Pa. 188, 202; Locke's Appeal, 72 Pa. 491, 498, 13 Am.Rep. 716." Hampton, Jr., & Co. v. U. S., supra, 276 U.S. 394, at pages 406, 407, 48 S.Ct. 348, 72 L.Ed. 624. (Italics added.)

As I said in my previous opinion, the Congress has provided in the marketing provisions of the Agricultural Adjustment Act a clear and definite standard (or rule). And the discretion which it has delegated is limited by that standard. Or, to use the language of Mr. Chief Justice Taft, in another portion of the opinion in Hampton, Jr., & Co. v. United States, supra, 276 U.S. 394, at page 409, 48 S.Ct. 348, 352, 72 L.Ed. 624, the Congress of the United States has laid down by legislative act "an intelligible principle" to which the Secretary of Agriculture "is directed to conform."

This is a strict observance of the constitutional limitations in the matter of delegation of legislative power.

For these reasons and for the reasons stated in the previous opinion, the decree will be for the plaintiff and a permanent injunction will issue. Exception to the defendant.