**HUDSON–DUNCAN & CO. v. WALLACE, Secretary of Agriculture.**

**No. 9612.**

District Court, D. Oregon.

May 17, 1937.

Albert W. Gentner, of Portland, Or., for plaintiff.

J. Mason Dillard, Asst. U. S. Atty., of Portland, Or., G. P. Peyton, Atty., Department of Agriculture, of Washington, D. C., and John W. Aiken, Sp. Asst. to the Atty. Gen., for defendant.

JAMES ALGER FEE, District Judge.

This cause arises under an order issued by the Secretary of Agriculture under the provisions of the Agricultural Adjustment Act as amended. 7 U.S.C.A. § 601 et seq.[1] A summary of the provisions of the amended act is necessary for a determination of the questions raised. The original law, by a section still retained, declared an emergency because of "a severe and increasing disparity between the prices of agricultural and other commodities" which had "burdened and obstructed the normal currents of commerce in such commodities." Section 601. It is therefore declared to be the policy of Congress, through the exercise of powers delegated to the Secretary of Agriculture,[2] "to establish and maintain such balance between the production and consumption of agricultural commodities, and such marketing conditions therefor, as will reestablish prices to farmers at a level that will give agricultural commodities a purchasing power with respect to articles that farmers buy, equivalent to the purchasing power of agricultural commodities in the base period." Section 602. The Secretary of Agriculture, if he finds that it will effectuate the declared policy of the act, after proper notice, will enter into marketing agreements with those engaged in the handling of any agricultural commodity or product who are designated as "handlers." Section 608c, subd. (1). Subject to the same conditions, he may issue orders. Such orders shall regulate, in the manner provided, only such handling of an agricultural commodity, or product thereof, as is in the current of interstate or foreign commerce, or which directly burdens, obstructs, or affects, interstate or foreign commerce in such commodity or product thereof. Section 608c, subd. (1). Such an order may be applicable to walnuts (section 608c, subd. (2), but shall be issued only upon due notice and after hearing (section 608c, subd. (3), at which findings shall be made (section 608c, subd. (4). The act provides that orders issued relating to walnuts, among other commodities, shall contain one or more of the following terms and provisions: (a) Limiting the quantity of the commodity which may be marketed or transported; (b) allotting the amount of the commodity which each handler may purchase; (c) allotting the amount of the commodity which each handler may market or transport to market; (d) determining the extent of the surplus of the commodity and providing for the control and distribution of the surplus; and, (e) permitting the establishment of reserve pools of the commodity and for equitable distribution of the net returns. Section 608c, subd. (6). Orders are required to contain one or more of the following terms and conditions: (a) Prohibiting unfair methods of competition and unfair trade practices in the handling; (b) providing that the commodity shall be sold by the handlers only at prices filed by such handlers; (c) providing for the selection of an agency or agencies which shall have the power, first, to administer the order; second, to make rules and regulations to carry out the order; third, to investigate the complaints of violations; and, fourth, to recommend amendments. A member of an agency is not deemed to be acting in an official capacity unless he receives compensation from the United States. Section 608c, subd. (7). Where an order is issued with a marketing agreement, it shall not become effective until the handlers of not less than 50 per cent. of the volume of the commodity within the area of the order have signed the marketing agreement, and shall not be effective until approved by at least two-thirds of the producers by number, or by producers who have produced for market at least two-thirds of the volume of such commodity. Section 608c, subd. (8). No order shall be issued which is applicable to all production areas of the commodity unless the Secretary finds that the issuance of several orders would not effectively carry out the declared policy. Section 608c,

---

[1] Subsequent references, unless otherwise noted, are to 7 U.S.C.A.

[2] Where the term "Secretary" is used in the following opinion, it is used to designate the Secretary of Agriculture or the Acting Secretary of Agriculture.

subd. (11). Approval or disapproval of the co-operative agency may be considered as the approval or disapproval of the members, the stockholders, or persons under contract with the association. Section 608c, subd. (12). Criminal penalties are provided for the violation of an order. Section 608c, subd. (14). "Any handler subject to an order may file a written petition with the Secretary of Agriculture, stating that any such order or any provision of any such order or any obligation imposed in connection therewith is not in accordance with law and praying for a modification thereof or to be exempted therefrom." Section 608c, subd. (15) (A). A hearing is provided, after which the Secretary shall make a ruling which shall be final "if in accordance with law." The District Courts are vested with jurisdiction in equity to review such ruling, provided a bill in equity is filed within 20 days from the date of entry of such ruling. Service of process is made by delivering a copy of the bill of complaint to the Secretary. Section 608c, subd. (15) (B). Under certain conditions, the Secretary may terminate or suspend an order or terminate a marketing agreement. Section 608c, subd. (16). Handlers are required to furnish the Secretary with information as to how the agreement or order is being carried out. Section 608d. In connection with the marketing agreement or an order, the Secretary, if he find that the base period cannot be satisfactorily determined from available statistics of the department, may use the post war period as a base. Section 608e. The Secretary is authorized to establish state and local committees, or associations of producers, to act as agents of their members in carrying out the act. Under these circumstances, the orders issued shall provide that each handler subject thereto shall pay a pro rata share of the expenses incurred by such agency. Section 610.

Pursuant to the provisions of the act, R. G. Tugwell, Acting Secretary of Agriculture, gave proper notice and held hearings for the entering of market agreements, and the issuance of an order, regulating the handling of walnuts grown in Oregon, California, and Washington. Thereafter, when handlers of not less than 50 per cent. of the walnuts had signed a marketing agreement "which regulates the handling of said commodity in the same manner as this order regulates it," and the issuance of the order was approved or favored by at least two-thirds of the producers by volume, the Secretary issued an order, the salient provisions of which will be summarized.

The Secretary determined that the post war period should be used as the base, and upon the evidence concluded: "That more than ninety percent (90%) of the merchantable walnuts grown in California, Oregon and Washington enter into the current of interstate and foreign commerce, and that the handling of walnuts grown in California, Oregon and Washington is in the current of interstate and foreign commerce and directly burdens, obstructs, and affects interstate and foreign commerce in said commodity."

He found that the average price to carry out the provisions of the act should be 17 cents per pound, and that the farmer was only receiving 70 per cent. thereof, and that the low level of prices resulted from a production of more walnuts than could be disposed of, and declared a surplus of 30 per cent., and levied upon each handler 9 cents for each 100 pounds of walnuts handled. He declared that the order was limited in its application to the smallest regional production area of the commodity which is practicable and consistent with carrying out the declared policy of the act. The terms used in the order were given special meaning by a schedule of definitions. A Control Board was appointed consisting of nine members. It was provided that thereafter each of the following groups should nominate four persons from whom the Secretary should select one from each group to fill the places upon the board after the first Monday of April, 1936, viz.: The co-operative packers of California, all packers other than co-operatives of California; a group of packers doing business in California who during the preceding crop year marketed more than 50 per cent. of the walnuts packed in the state and subjected to surplus control; growers of walnuts whose orchards are located in California and who market their commodities through co-operative packers; growers in California whose walnuts were marketed through the packer group above mentioned, handling more than 50 per cent. of the walnuts packed in California; the packers within Washington and Oregon; growers whose orchards are located in Washington and Oregon. The ninth member, who was to act as Secretary, was to

be selected by the other members. The powers and duties of the Control Board are prescribed, and its decisions are to be by a majority vote. The members are subject to removal or suspension by the Secretary at any time, and each and every order, regulation, and determination or other act of the Control Board is subject to the disapproval at any time by the Secretary.

Article III of the order sets up an elaborate schedule for the control of distribution, the provisions of which are set out verbatim in the footnote.[3]

---

[3] Article III.—Control of Distribution.

Section 1. Authorized Packs.—Except as otherwise provided in article VII hereof for the sale of cull walnuts, no packer shall handle any unshelled walnuts other than merchantable walnuts, and no packer shall handle walnuts except those packed in accordance with the pack specifications contained in Exhibit A hereto attached or in accordance with such other pack specifications as the Control Board, on application of any packer, and with the approval of the Secretary, may prescribe. Walnuts meeting such special pack specifications and meeting the requirements of the Federal Standard shall be deemed to be merchantable walnuts.

Sec. 2. Salable Percentage and Surplus Percentage.—On the basis of total carry-over, estimated consumptive demand for merchantable walnuts, and estimated production of merchantable walnuts, the salable percentage for the crop year September 1, 1935, to August 31, 1936, shall be seventy (70) percent. The Secretary may, at any time on request of the Control Board (or if the Control Board shall refuse so to request, then after reasonable notice and hearing by the Secretary on request of two or more packers who have handled during the preceding crop year at least ten (10) percent of the total tonnage handled by all packers during such crop year), and after a finding of fact that the merchantable walnuts available for sale will not be sufficient to supply the consumptive demand, increase the said salable percentage to conform with such new relation as may be found to exist between consumptive demand and production. Thirty (30) percent, being the difference between the salable percentage and 100 percent, shall be the "surplus percentage" for said crop year. A quantity equal to the surplus percentage of any lot of merchantable walnuts shall be the surplus walnuts.

Sec. 3. Estimates of Carry-over, Consumptive Demand and Production for Succeeding Years.—As a basis for recommending amendments to the foregoing section for application to succeeding years, the Control Board shall estimate, not later than September 1 of each year, the quantity of merchantable walnuts to be produced during the coming crop year, herein referred to as the "estimated production", such estimate to be approved by at least a two-thirds (⅔) vote of the Control Board, and shall, likewise, estimate the total consumptive demand in the United States for merchantable walnuts for the coming year (on the basis of prices not exceeding the fair exchange value as defined in the Act), such estimate to be approved by at least a two-third (⅔) vote of the Control Board, and shall, likewise, ascertain or estimate the total carry-over of merchantable walnuts from preceding crop years held by packers on August 1 preceding such crop year. The Control Board shall then make a report thereon to the Secretary with a recommendation of the salable percentage to be fixed for the coming crop year by amendment to section 2 hereof, pursuant to the terms of the Act.

Sec. 4. Report of Carry-over.—Every packer, on or before August 15 of each year after 1935, in order to facilitate the administration of the terms and conditions of this Order, shall file with the Control Board a sworn statement of the merchantable walnuts held by him on the first day of that month, showing the quantity, pack, quality and location thereof.

Sec. 5. Individual Supply.—The individual supply of merchantable walnuts for each processor shall be, at any time during the crop year, the merchantable walnuts packed by him during such crop year up to that time, and, for each distributor, all merchantable walnuts acquired during the crop year up to that time and which have not been subjected, in the hands of a previous holder, to compliance with the surplus control provisions of this Order.

Sec. 6. Quota for Handling not to be Exceeded.—No packer shall exceed his quota which is hereby fixed for him by the Secretary by handling, (except as provided in sections 9 and 12 of this article), any merchantable walnuts, except on condition that before shipment thereof he shall deliver to the Control Board the surplus percentage of each pack and quality of such packer's individual supply to be so handled plus the surplus walnuts referable thereto.

Sec. 7. Delivery of Surplus to Control Board.—Every packer shall deliver to the

Control Board as trustee, at such places as the Control Board may designate, the surplus percentage of each pack and quality of the individual supply handled or to be handled by such packer plus the surplus walnuts referable thereto. Such packer shall be credited for the respective packs and qualities so delivered with the credit values thereof as fixed by the Control Board, with the approval of the Secretary, pursuant to section 1 of article IV. A packer may substitute an equal weight of merchantable walnuts of any pack and quality for merchantable walnuts theretofore delivered by such packer to the Control Board and still held unsold by the Control Board. Upon such substitution, if the credit value of the pack and quality delivered to the Control Board is less than the credit value of the pack and quality returned by the Control Board to the packer, the difference shall be paid in cash to the Control Board by the packer; if more, the difference shall be credited to the packer by appropriate adjustment in credit value for the surplus walnuts delivered by such packer. Any such money paid to the Control Board, and not refunded as herein provided, or released under the provisions of section 9, shall be considered as proceeds from the sale of surplus walnuts, except that it shall be held undistributed by the Control Board until the end of the crop year. If, upon a substitution, the credit value of the walnuts delivered by a packer exceeds the credit value of those returned to him by the Control Board, and such packer has previously paid cash representing the difference in values of walnuts theretofore exchanged, he shall be refunded therefrom such amount as may be in excess of the amount necessary to maintain his total credit for all the surplus walnuts he is required to deliver. All costs of such substitution shall be borne by the packer requesting the substitution.

Sec. 8. Additional Requirements as to Surplus Walnuts.—No packer who in any succeeding year has a carry-over from which he has not deducted and delivered to the Control Board the surplus percentage shall handle such walnuts except on condition that before shipment thereof he shall deliver to the Control Board the surplus walnuts referable to any quantity handled or to be handled, or the credit value thereof, as determined for the year in which such walnuts were produced. Such surplus walnuts and such cash payments so delivered or paid shall be subject to the same terms and conditions as are applicable under sections 7 and 9 hereof to surplus walnuts and cash payments of the preceding crop year.

Sec. 9. Sale of Surplus by Individual Packer.—At any time before December 31 of any year, any packer, having sold or contracted to sell any part or all of his surplus walnuts, shall be entitled to have redelivered to him such surplus walnuts so sold or contracted for sale out of those previously delivered by him and still held unsold by the Control Board. Simultaneously with the redelivery of such walnuts by the Control Board to the packer, the packer shall pay to the Control Board the credit value thereof. Such payment or a ratable proportion thereof (determined by relative weights) shall be refunded to the packer upon delivery by him to the Control Board, at any time prior to January 15 of the same crop year, of a quantity of merchantable walnuts of the same pack and quality, to replace in whole or in part any lot of surplus walnuts theretofore sold by him; or, in the event of such delivery to the Control Board of walnuts of a different pack and quality, such refund shall be made after appropriate adjustment as required by section 7 hereof for difference in credit value of walnuts exchanged.

Sec. 10. Adjustment of Surplus Accounts upon Increase of Salable Percentage.—Upon any increase in the salable percentage, and corresponding decrease in the surplus percentage pursuant to section 2 hereof, the Control Board shall release to each packer, at his option, such walnuts theretofore delivered by him and/or such cash thereafter paid by him, and make such other adjustment in his credits, as will cause each packer's surplus account to conform to the reduced surplus percentage and to reflect any exchange made by such packer.

Sec. 11. Disposition of Cash Deposits.—Any money received by the Control Board, as specified in sections 8 and 9, and remaining in its possession on or after January 15 of the current crop year, shall be used by said Control Board to purchase, at the applicable credit values, from any packers unsold walnuts held by them within their salable percentage of merchantable walnuts (as to which the surplus percentage or credit value thereof has been or will be delivered to the Control Board). If the fund is insufficient to purchase all of the walnuts remaining within the salable percentage of all such packers, the Control Board shall offer to purchase such walnuts ratably from such packers in proportion to their said holdings on date of offer and at the then values fixed by the Control Board, with the approval of

Article IV deals with credit values of walnuts delivered to the Control Board. These provisions are likewise set out in full.[4] It is provided that the Control Board shall have power and authority from time to time to sell or dispose of the holdings

the Secretary, for the credit of surplus walnuts as provided in section 1 of article IV. In the event the salable percentage should be increased after the purchase by the Control Board of walnuts from the salable percentage of the packers, as herein provided, and there should not remain in the possession of said Control Board cash deposits in a sum sufficient to make refunds in accordance with section 10 hereof, the packers by whom such walnuts were sold to the Control Board shall be required to refund the proceeds thereof, ratably in proportion to the amounts of their respective sales, to the extent necessary to refund to the Control Board a total amount sufficient to enable the Control Board to make the refunds required by said section 10, and the Control Board shall redeliver to such packers the walnuts purchased by such refunded proceeds, or walnuts of equivalent credit value. All purchases of walnuts by the Control Board pursuant to the terms of this section shall be subject to the conditions of refund as above provided. Any cash deposits that may remain at the close of the crop year over and above those used for completed purchases as herein provided shall become part of the holdings of the Control Board in the, same manner and for the same purposes as the proceeds of surplus walnuts disposed of by said Control Board.

Sec. 12. Postponement of Settlement for Surplus upon Filing Bond.—Compliance by any packer with the requirements of sections 6, 7, and 9 of this article as to the selling of surplus walnuts, or the times when he shall deliver to the Control Board surplus walnuts or shall pay to it the credit value of sales thereof, shall be deferred until December 31 of each crop year upon his executing and delivering voluntarily to the Control Board before he handles any walnuts of such crop year, a written undertaking to deliver, not later than December 31 the surplus percentage of his individual supply of merchantable walnuts, or the credit value thereof, in accordance with the requirements of this Order and any state agreement that may be in force, and a bond or bonds with a surety or sureties acceptable to the Control Board, in the penal amount or amounts stated below, conditioned upon full compliance with such undertaking. Such bond or bonds shall be in such penal amount or amounts that the aggregate thereof shall at all times equal the credit value of the surplus percentage of the entire individual supply already packed by the packer filing same. The bond first delivered shall be in a penal amount equal to at least twenty-five (25) percent of the amount estimated by the Control Board, or such agent or employee as it shall designate, as the credit value of the surplus percentage of the entire individual supply to be packed during such crop year by the packer filing same, and such additional bonds shall be executed and delivered from time to time as will meet the requirements hereinabove contained. Should any packer fail to deliver such additional bonds as may be required, the privileges hereunder shall cease. The cost of such bond shall be borne by the packer delivering same.

[4] Article IV.—Credit Values of Walnuts Delivered to the Control Board.

Section 1. Credit Values.—The Control Board shall in 1935 within five (5) days after the effective date of this Order, and thereafter on or before October 15 of each year, establish, subject to the approval of the Secretary, credit values for each pack and quality of merchantable walnuts, including such special packs as may be prescribed pursuant to section 1 of article III. The establishment of credit values shall require a vote of at least two-thirds ($\frac{2}{3}$) of the members of the Control Board. To aid the Secretary in determining whether to grant or withhold such approval, the Control Board shall furnish to the Secretary the data upon which it acted in establishing such credit values and such other data pertaining thereto as the Secretary may request. All merchantable walnuts delivered to the Control Board shall be credited to the packer delivering same at the credit values so fixed. Such credit values shall provide reasonable differentials for the different packs and qualities, such as will reflect the normal differences in market prices thereof. Each packer shall also be credited with any money payments made by him in accordance with the provisions of sections 7, 8, and 9 of article III. The credits herein specified shall be made for the purpose of determining the interest of each packer in the holdings of the Control Board.

Sec. 2. Interest of Packers in Holdings of Control Board.—The equitable interest of each packer in the holdings of

of merchantable walnuts at best prices obtainable, consistent with the ultimate disposition of the surplus but subject to the conditions that no merchantable walnuts shall be sold as unshelled walnuts except to shellers, except that it "may, in its discretion, distribute within the United States to charitable institutions for charitable purposes surplus walnuts as donations," or at such prices as it may determine. It may, under certain conditions, sell for export but shall not dispose of more than 50 per cent. of the surplus walnuts delivered prior to January 15 of any crop year. If the combined carry-over and estimated production for any coming year be less than the estimated consumptive demand in the United States, the Control Board shall release proportionately to each packer an appropriate part thereof. Article VI requires the packer to obtain the certificate for merchantable walnuts handled by him and for each lot delivered to the Control Board. Article VII permits the sale of cull walnuts to the shellers upon the issuance of a certificate. In article VIII an assessment was made of 9 cents per 100 pounds for the current year for expenses, and provision is made that each packer shall pay such pro rata share of the expenses as the Secretary may find will necessarily be incurred during the specified period for the maintenance and function of the Control Board. In article IX the handlers are required to permit examination of books and records and furnish such information as is desired by the Secretary. Members of the Control Board are released from any responsibility for acts of commission or omission, except for acts of dishonesty. The provisions of the order are declared separable, and nothing in the order is to be construed to be a derogation or modification of the powers of the Secretary. Amendments may be proposed from time to time by the Control Board. The benefits and privileges conferred by the order cease upon its termination. The Secretary, by designation in writing, may name any person, whether an officer or employee of the government, or any bureau or division in the Department of Agriculture, to act as his agent or representative in connection with any of the provisions of the order. The Secretary may terminate the order by giving one day's notice and shall terminate it "whenever he finds that said Order, or such provision thereof, obstructs or does not tend to effectuate the declared policy of the Act."

"The Secretary shall terminate this Order at the end of any crop year whenever he finds that such termination is favored by a majority of the producers of walnuts who during the preceding crop season, have been engaged in the production for market of walnuts in the States of California, Oregon, and Washington: Provided, That such majority have during such period produced for market more than fifty (50) per cent of the volume of such walnuts produced for market within said states, but such termination shall be effective only if announced on or before August 1."

The order has appropriate provisions for winding up of the affairs of the Control Board upon termination of the order.

The Hudson-Duncan & Co. which operates retail mercantile stores in Oregon, Washington, and Idaho, and sells walnuts at wholesale and retail and in interstate commerce and within Oregon, objected to the application of the order to its business,

---

the Control Board shall be in the proportion of the net credits of such packer to the total net credits of all packers. For the purpose of this section, "holdings of the Control Board" means the merchantable walnuts held by or for it and the net proceeds from the sale, exchange or other disposition thereof by the Control Board, and the cash deposited with the Control Board by the packers pursuant to section 8 of article III hereof, and the cash deposited with the Control Board by the packers pursuant to section 7 of article III hereof, which has not been refunded or released to the packers before the end of the crop year, and the cash deposited with the Control Board by the packers pursuant to section 9 of article III hereof as the proceeds of the sale by the packers of surplus walnuts, and unexpended by the Control Board at the end of the crop year; but shall not include such moneys, if any, as may be received by the Control Board as benefit payments or indemnities in connection with the encouragement of exportation or encouragement of domestic consumption pursuant to the provisions of section 32 of the Act to amend the Agricultural Adjustment Act and for other purposes, Public No. 320, 74th Congress, approved by the President August 24, 1935. The Control Board shall distribute from time to time the cash "holdings of the Control Board" ratably to the packers in accordance with their respective interests therein.

and filed petition under the terms of the act, praying that the order, as applied to its business, be declared "not in accordance with law," and that an order might be made striking therefrom all compulsory requirements, and that the company be exempted from the operation thereof. After hearing, a ruling was made upon the prayers of the petition, accompanied by general and specific findings of fact, averring the constitutionality of the act and the order, and refusing to exempt the petitioner from the operation thereof. The Hudson-Duncan & Co. failed to agree with this result, and filed a bill in equity within the time allowed by the act, praying for a decree vacating the order and exempting the company from the provisions thereof. In the petition to the Secretary, plaintiff attacked the constitutionality of the act and the order, and the failure of the latter to conform to the Constitution or the governing statute, and makes the assault in identical form in the bill in equity. The grounds need not be here stated even in epitome, except to note that all points hereinafter dealt with are properly reserved.

No question of fact was presented by the bill in equity, and the review is asked upon matters of law alone. At the hearing, the original order and the ruling of the Secretary upon the petition was introduced. The court rejected, at the instance of the plaintiff, the evidence taken by the Secretary at the primary hearings before the promulgation of the general order, and likewise the testimony taken at the special hearing upon the petition of Hudson-Duncan & Co.

■ The court had jurisdiction of the proceeding under the terms of the act, and by the voluntary appearance of the Secretary of Agriculture therein. The primary question is the scope of the review. The government contends that neither the constitutionality of the act nor of the terms of the order are involved. Petitioner maintains a contrary position. The Constitution of the United States is the supreme law of the land. If the terms of the act violate the fundamental guarantees, it is in so far void, and action attempted under such provisions is "contrary to law." If the order is in accordance with the terms of the act, and the act is unconstitutional, the order is "not in accordance with law." If the terms of the order transcend the power delegated by the statute, such pro-

visions are by the very statement "contrary to law."

The constitutionality of the act and order are attacked upon the following grounds: (1) That there is no power to prohibit the shipment of walnuts in interstate commerce; (2) that there is no power to take walnuts from a packer; (3) that there is no power to fix the price of walnuts; (4) that the act unlawfully delegates legislative authority to the Secretary of Agriculture; and (5) that the purpose is the regulation of walnut production and sale and not the regulation of interstate commerce. These objections will be dealt with first, as regards the act; and, second, with regard to the terms of the order.

■■ In the first place, then, in regulating the flow of interstate commerce under the terms of the act, incidental restraint of transportation for specified periods of time might be required, and, if so, would not exceed the power of Congress. See Kentucky Whip & Collar Co. v. Illinois Central Railroad Company, 299 U.S. 334, 346, 57 S.Ct. 277, 279, 81 L.Ed. 270. A flow of goods cannot be regulated without the power to restrain and release. In the second place, notwithstanding the provisions relating to allotments and the establishment of pools, Congress did not directly provide for the taking of property, either for public use or for private use. In the third place, there is no provision of the act which directly fixes the price of walnuts or other commodities in interstate commerce.

■ The next question is whether there has been an unconstitutional delegation of legislative power. The Congress have strictly confined the administrative officials by the provisions of the enactment to the regulation of interstate and foreign commerce. The field of their operation was thus limited by constitutional boundaries. The law prescribed that no action should be taken in this field until certain facts had been established at public hearings after notice. Before action, the Secretary was required to find upon the evidence introduced at a hearing that the issuance of such an order and all the terms and provisions thereof would tend to effectuate the declared policy of the act. Section 608c, subd. 4. Certain specific provisions which might be placed in the order were prescribed. Section 608c, subds. 6, 7. The opportunity for judicial review has been afford-

ed. A definite and suitable test for action was laid down in the declaration of policy. Whether such "a balance between production and consumption of agricultural commodities as would reestablish prices to farmers at a level which would give agricultural commodities a purchasing power with respect to the articles that farmers buy equivalent to the purchasing power of agricultural commodities in the base period" is a specific question which could be determined as to a particular commodity by taking evidence of the facts.

On the other hand, the order, although binding on all those who "handle" walnuts, is required to be approved by two-thirds of the producers either by number or by volume of the production at the election of the Secretary, and by 50 per cent. of the handlers. The order, by virtue of the enactment, when adopted, bound the handlers within the purview by positive provisions, and violations thereof became punishable as crimes. The statute permitted the erection of an agency to administer the order, but allowed the Secretary full authority to designate the personnel thereof. No limitation as to the qualification of members was laid down. Freedom from affiliation with competitive interests was not required. Even the type of agency was not designated by the Congress, although an outline of its powers and duties is prescribed. Both of these features seem to indicate that the lines of demarkation were not properly observed.[5] However, in view of the nebulous character of rulings on administrative delegation at the present time, so far as this court is concerned, the presumption of constitutionality must prevail.

Finally, the objection that the Congress are attempting to control production of agricultural commodities by the use of the "commerce clause" requires more extended consideration. The original enactment, to which the statute under consideration is an amendment, was held to be unconstitutional in certain features, because there was an attempt to control production of certain crops with the aid of the taxing power.[6] Similar attempts to control the internal policy of the various states by the aid of the "commerce clause" have been disapproved.[7] Because of the wording of the original act, the latter clause was neither urged nor considered as a bulwark to sustain the law.[8] It is true the declared policy of the original act, "to establish and maintain such balance between the production and consumption of agricultural commodities * * * as will reestablish prices to farmers," is reaffirmed in the amendment. The authority to act under the amended law, however, is conditioned upon the existence of facts inimical to this declaration. But the use of the taxing power to control production is abandoned. Nor has the Congress attempted to take money from one group of persons and give it to another.[9] The amended act (7 U.S. C.A. § 601 et seq.) stands, therefore, upon an entirely different footing than the original (48 Stat. 31), and must be given independent consideration.[10]

The question, then, is whether in this delegation of power, characterized by such a purpose, the Congress "have prescribed the rule by which commerce is to be governed,"[11] or have infringed upon limitations prescribed in the Constitution. It must be considered, first, that control is to be exercised only upon such handling of agricultural commodities as is in the current of or which directly burdens, obstructs, or affects interstate and foreign commerce. Secondly, the standard provisions of the orders to be issued embody forth a system of regulation of the flow of such commerce in the particular commodity.[12] Next, no violation of the provisions of the Fifth Amendment is foreshadowed. The final query must be whether the terms of the Tenth Amendment have been observed, notwithstanding the provisions which still

---

5 See Chester C. Fosgate Co. v. Kirkland (D.C.) 19 F.Supp. 152, contra; United States v. Goldsmith Fruit Co. (D.C.) 19 F.Supp. 147.

6 United States v. Butler, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914.

7 Hammer v. Dagenhart, 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101, 3 A.L.R. 649, Ann.Cas.1918E, 724.

8 United States v. Butler, supra, 297 U.S. 1, 63, 64, 84, 56 S.Ct. 312, 318, 327, 80 L.Ed. 477, 102 A.L.R. 914.

9 See Cincinnati Soap Co. v. United States, 301 U.S. 308, 57 S.Ct. 764, 81 L.Ed. 1122, opinion United States Supreme Court, May 3, 1937.

10 United States v. Edwards (D.C.) 14 F.Supp. 384; Id. (D.C.) 16 F.Supp. 53.

11 Gibbons v. Ogden, 9 Wheat. 1, 196, 6 L.Ed. 23.

12 See Kentucky Whip & Collar Co. v. Illinois Central Railroad Company, 299 U.S. 334, 345, 57 S.Ct. 277, 279, 281, 81 L.Ed. 270.

look toward a control of production. See section 608.

■■ Under the Tenth Amendment, the Congress may not by the ostensible use of any enumerated power dictate what the internal policy of any state shall be.[13] Be the obvious or declared purpose what it may, however, the Congress can constitutionally enact legislation strictly within the scope of an enumerated power, although thereby a policy of a particular state may be affected,[14] production in a local business curtailed or destroyed,[15] or protection extended to a local industry.[16]

Enactments under the "commerce clause" have been uniformly upheld where the means designated were regulatory, although an entirely ulterior purpose was subserved by the regulation. A law, construed to prohibit a meretricious relationship which involved without commercial features the accidental crossing of a state boundary, was upheld, in order to guarantee "that reverent morality which is the source of all beneficent progress in social and political improvement."[17]

The prohibition against crossing a state line with a person theretofore kidnapped was sustained for the purpose of aiding "in the protection of the personal liberty of one who has been unlawfully seized or carried away."[18] The acts above noted, in the absence of monetary features, could hardly be characterized as "commerce," except by a secondary and synthetic meaning of the word.

But an ulterior economic purpose has likewise been sustained. The law relating to transportation of stolen motor vehicles across an interstate boundary was found valid, although the purpose was to prevent the "defeat of the property rights of those whose machines against their will are taken into other jurisdictions."[19] An act regulating interstate shipment of convict-made goods (49 U.S.C.A. §§ 61–64) has been upheld, notwithstanding the underlying theory, which had nothing to do with the transportation, "that free labor, properly compensated, cannot compete successfully with the enforced and unpaid or underpaid convict labor of the prison."[20] The classic examples of such underlying motives are the control of monopolies,[21] and the levying of tariffs under the "commerce clause," whereby strictly economic results were obtained.[22] The exercise of an enumerated power is not vitiated by an "incidental motive."

The farmer cannot compete successfully where on the one hand prices are forced upon him for the commodities which he raises, by world conditions, and, on the other hand, his necessities are sold to him at a higher scale, because of circumstances beyond his control. Especially is this true, as he is often required to pay the cost of transportation both of the products he raises and the goods he purchases. So long as the Congress regulated interstate and foreign commerce alone, therefore, the objection that there was an attempt to cure the economic evil above outlined could have no validity. The act was constitutional.

■ Consideration must now be given to the conformity of the various provisions of the order to the law. There is no question in this case of review of the evidence, relating to the findings upon which the order is based, nor of other evidence which was not heard by the delegated official.[23] The facts found by the Secretary in the

---

[13] Hammer v. Dagenhart, supra; United States v. Butler, supra.

[14] See Minnesota Rate Cases, 230 U. S. 352, 33 S.Ct. 729, 57 L.Ed. 1511, 48 L.R.A.(N.S.) 1151, Ann.Cas.1916A, 18; Houston, East & West Texas Railway Co. v. United States, 234 U.S. 342, 34 S. Ct. 833, 58 L.Ed. 1341; Board of Trustees v. United States, 289 U.S. 48, 53 S.Ct. 509, 77 L.Ed. 1025.

[15] McCray v. United States, 195 U.S. 27, 62–64, 24 S.Ct. 769, 49 L.Ed. 78, 1 Ann.Cas. 561.

[16] Hampton & Co. v. United States, 276 U.S. 394, 411, 48 S.Ct. 348, 352, 72 L.Ed. 624.

[17] Caminetti v. United States, 242 U.S. 470, 487, 37 S.Ct. 192, 195, 61 L.Ed. 442, L.R.A.1917F, 502, Ann.Cas.1917B, 1168.

[18] See Kentucky Whip & Collar Co. v. Illinois Central Railroad Company, supra; Gooch v. United States, 297 U.S. 124, 56 S.Ct. 395, 80 L.Ed. 522.

[19] Brooks v. United States, 267 U.S. 432, 439, 45 S.Ct. 345, 346, 69 L.Ed. 699, 37 A.L.R. 1407.

[20] See Kentucky Whip & Collar Co. v. Illinois Central Railroad Company, supra.

[21] Northern Securities Co. v. United States, 193 U.S. 197, 24 S.Ct. 436, 48 L.Ed. 679.

[22] Hampton & Co. v. United States, supra.

[23] See Crowell v. Benson, 285 U.S. 22, 46, 52 S.Ct. 285, 290, 76 L.Ed. 598.

order and in the ruling upon the petition are accepted as true. It is well settled now that administrative decisions must be based upon facts found.[24] Accepting the principle applied to the Interstate Commerce Commission, it is found that, "while presumed valid, its order may be annulled if shown to rest upon a misconstruction of the Act or upon inadequate or unsupported findings of fact." Particularly must this be true where the field of action is delimited by bulwarks of the Constitution. If this were not so, administrative action under delegated power would be unfettered of constitutional limitation. When the statute delegating power to act itself marks off the boundaries of the field of activity, the administrative official must find himself within these limits in order to show that the action may not be extralateral.[25]

"When, therefore, such an administrative agency is required as a condition precedent to an order, to make a finding of facts, the validity of the order must rest upon the needed finding. If it is lacking, the order is ineffective." Wichita Railroad & Light Co. v. Public Utilities Commission, 260 U.S. 48, 59, 43 S.Ct. 51, 55, 67 L.Ed. 124; Panama Refining Co. v. Ryan, supra.

■ The statute required that only such handling be regulated "as is in the current of interstate or foreign commerce, or which directly burdens, obstructs, or affects, interstate or foreign commerce in such commodity or product thereof." Section 608c, subd. (1). It was incumbent, therefore, for the official to make an explicit finding of fact upon this point as a condition precedent to action.

■ The Secretary did find "that more than ninety per cent of the merchantable walnuts grown in California, Oregon and Washington enter into the current of interstate and foreign commerce, and that the handling of walnuts grown in California, Oregon and Washington is in the current of interstate and foreign commerce and directly burdens, obstructs and affects interstate and foreign commerce in said commodity." This sentence reads like a finding that all traffic in walnuts in any of the three states, whether the commodity is shipped over the border of any state or not, directly burdened, obstructed, or affected interstate or foreign commerce. But

the definition of the word "handle" given in the order itself, shows that the sentence above quoted is tautological. "Handle" means, according to the order, "to sell for shipment in, to ship in, or in any other way to put into the channels of trade in the current of interstate or foreign commerce or so as directly to burden, obstruct, or affect interstate or foreign commerce." Therefore, the sentence reconstructed with this definition substituted for the term "handle," reads: "That more than ninety percent (90%) of the merchantable walnuts grown in California, Oregon and Washington enter into the current of interstate and foreign commerce, and that the selling for shipment in, shipping in, or in any other way putting into the channels of trade in the current of interstate or foreign commerce or so as directly to burden, obstruct or affect interstate commerce of walnuts grown in California, Oregon and Washington is in the current of interstate and foreign commerce and directly burdens, obstructs, and affects interstate and foreign commerce in said commodity."

The result is apparent. Thus, there is no finding of fact in the order or in the ruling on the petition which indicates that the intrastate traffic in merchantable walnuts has any effect, whatsoever, upon either interstate or foreign commerce.

If it be thought a technical position to bind the Secretary to a strict construction of the words which he, himself, has used on a condition precedent to jurisdiction, still the regulation of intrastate commerce is unsupported, first, because the facts found are inadequate to bring trading in Oregon in walnuts under the terms of the act.

The only finding of the order which is in anywise pertinent is that 90 per cent. of the merchantable walnuts from the production area enter the current of interstate and foreign commerce. It is found that by reason of this fact, prices to the producers are affected, and there is overproduction. There is no finding as to the amount of such walnuts sold locally in the respective states. There is no finding as to what effect local sales or local consumption have upon prices in interstate or foreign commerce, nor even upon production. The order declares 30 per cent. of the entire crop

---

[24] Panama Refining Co. v. Ryan, 293 U.S. 388, 431, 55 S.Ct. 241, 253, 79 L. Ed. 446.

[25] Panama Refining Co. v. Ryan, supra.

to be surplus, without reference to the amount of such walnuts (at least 10 per cent. of the entire production) consumed in the producing states. If the order were carried out according to its terms 70 per cent. of the crop would go into interstate commerce and 30 per cent. to the Control Board, and the people of California would be required to buy walnuts from Oregon for domestic consumption. No account is thus taken of the effect of intrastate trade or consumption, either in the declaration of the surplus or in the other terms of the order. Not only control, but destruction of intrastate trade in walnuts would result from the strict enforcement of the order.

Notwithstanding the nonexistence of the finding, the Secretary regulated intrastate commerce in walnuts in Oregon. The control provisions have been set out verbatim. In its brief, the government states that those provisions of the order do not have the effect of regulating intrastate commerce. This is a positive misstatement. There can be no doubt of the intention and effect of the order. The handler for every seven bags of walnuts shipped to whatever destination was required to deliver three to the Control Board. As to these three, the handler would have had no intention to ship in interstate commerce, nor would he have initiated transportation. Thus, none would ever enter the stream of such commerce on his motion. If the order had only gone to the prohibition of shipment of the three bags, another question might have been presented. See United States v. Edwards, supra. There is, then, direct regulation and confiscation of specific goods which had no relation to interstate commerce, but were simply part of the goods within the state.

The specific walnuts, under the decisions, had not entered the stream of interstate commerce under the decisions of the United States Supreme Court.

Where an owner with the intention of ultimately shipping specific goods outside the state transports them to a depot within the state, but does not launch them upon their final journey, it is held such goods are still in state control.[26]

Certainly, if the owner entertains no intention of shipping specific goods out of the state, such goods cannot be said to be subject to federal regulation.

But the order does not, in terms, act upon the goods themselves, but upon the "handlers," of which plaintiff is one. Applying the term of the order specifically to plaintiff, it is still invalid. Plaintiff will acquire certain merchantable walnuts in Oregon. Part of these it will intend to sell at retail, and part at wholesale in the state. Part it will intend to ship to points without the state. The Secretary, based on the evidence offered upon the petition, found: "The petitioner offered evidence to the effect, generally, that it is engaged in the regular course of its business, in shipping large quantities of walnuts directly in interstate commerce, and, in shipping comparatively small quantities of walnuts within the state of Oregon." It was further found: "Intrastate trade in merchantable walnuts during said crop year (1934–35) accounted for 8.26% and 18.87% of the total shipments from California and Oregon, respectively." Inasmuch as plaintiff is engaged in a business involving interstate commerce, it may well be that certain of its activities may be controlled and regulated in so far as they are in the current of interstate or foreign commerce or burden or affect such commerce.[27] If the plaintiff had shipped all merchantable walnuts in interstate and foreign commerce, this regulation would be within the power of the Secretary. But since it does not, the effects are curious. If Hudson-Duncan & Co. had heretofore shipped 81.03 per cent. in interstate commerce, and sold the rest to domestic markets, it would, hereafter, if the order were followed, ship 70 per cent. in interstate commerce, and its domestic and retail trade would be destroyed, because the Control Board would receive the remaining 30 per cent. Plaintiff could only avoid this result by paying the "credit values" to the Control Board. No decision has been cited which holds that merely because 90 per cent. of a certain commodity in several states enters interstate commerce that restraint can be ex-

[26] Southern Pacific Co. v. Arizona, 249 U.S. 472, 39 S.Ct. 313, 63 L.Ed. 713; Coe v. Errol, 116 U.S. 517, 6 S.Ct. 475, 29 L.Ed. 715; Chicago, M. & St. P. R. Co. v. Iowa, 233 U.S. 334, 34 S.Ct. 592, 58 L.Ed. 988; Gulf, C. & S. F. R. Co. v. Texas, 204 U.S. 403, 27 S.Ct. 360, 51 L.

Ed. 540; Arkadelphia Milling Co. v. St. Louis Southwestern R. Co., 249 U.S. 134, 39 S.Ct. 237, 63 L.Ed. 517.

[27] National Labor Relations Board v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, rendered April 12, 1937.

308

ercised upon the portion which remains within the limits of a single state. If this doctrine were established, the boundaries between state and national jurisdiction over commerce would be entirely obliterated.

■ The terms of the order not only transcend the limits of national jurisdiction over interstate commerce, but permit confiscation of property of plaintiff. As before noted, the basic act contained no provisions, foreshadowing such action. The administrative official here also acted outside the delegated power.

The plaintiff is compelled to turn over for every seven bags of merchantable walnuts which it handles from its private property three other bags to the Control Board, and the title to these walnuts passes out of plaintiff. The Control Board has almost unlimited power "to dispose of," "sell," or "give away" for charity this property of plaintiff. A pro rata share in the proceeds after the expenses of administration are paid is the only interest therein remaining to plaintiff. Such action would constitute the "taking" of the private property of plaintiff, for which there was no specific statutory authority.

The Fifth Amendment, by implication, forbids the taking even under the authority of Congress of the private property of one person and the giving of it to another.[28] This was the probable rationale of the opinion in the case of United States v. Butler, supra. Although the power of Congress, under the "commerce clause," is coequal with that of the state because of its residual sovereignty, it is to be noted that the state cannot take private property of one for the use of another, even when regulating an industry, touched with public interest, for the public welfare.[29]

The order of the Secretary, by providing for the taking of plaintiff's property, was intended to benefit producers and other "handlers." The fact that a certain percentage of such groups had the power to prevent the issuance of the order or its termination, coupled with the Secretary's plan of appointing members to the Control Board from the nominees of certain of these groups, creates a situation like that disapproved in Carter v. Carter Coal Co., 298 U.S. 238, 311, 56 S.Ct. 855, 872, 80 L.

Ed. 1160. The very persons who bound themselves by contract to so manage their own property are thus given arbitrary control over the property of others. Certain it is that the nonconformist "handler" could not expect his individual interest to be protected by such a group in the disposal of the surplus which included his property. Property of plaintiff was thus subject to confiscation for the benefit of other private persons with alien interests.

Even if it were to be held that the taking of this property of plaintiff were for the public benefit, there is no provision for "just compensation."

■ The measure of compensation is a judicial, and not a legislative, question.

"The just compensation clause may not be evaded or impaired by any form of legislation. Against the objection of the owner of private property taken for public use, the Congress may not directly or through any legislative agency finally determine the amount that is safeguarded to him by that clause." Baltimore & Ohio Railroad Co. v. United States, 298 U.S. 349, 368, 56 S.Ct. 797, 807, 80 L.Ed. 1209.

But the Control Board, under the Secretary, for the purpose of raising prices to producers, could dispose of, sell, or give away the property of plaintiff, which the latter was compelled to hand over by criminal penalties, and require the acceptance as compensation of a pro rata share of what remained. The requirement that plaintiff pay the "credit value" instead of handing over "surplus walnuts" is exactly the same in operation and effect.

■ Even if the Secretary had under his powers under other portions of the same statute, 48 Stat. 38, as amended 7 U.S.C. A. § 612(c), purchased the surplus at a price sufficient to satisfy plaintiff and others in a like situation, the terms of the order could not be validated thereby, because in another year the arbitrary powers of the Control Board or the Secretary under the order might well be exercised to its detriment. In any event, Hudson-Duncan & Co. has not consented to the order nor to the powers which may be exercised pursuant thereto, except under compulsion, because of the criminal provisions of the enactment.

[28] Railroad Retirement Board v. Alton Railway Co., 295 U.S. 330, 357, 55 S.Ct. 758, 765, 79 L.Ed. 1468.

[29] Thompson v. Consolidated Gas Utilities Corporation, 300 U.S. 55, 57 S.Ct. 364, 81 L.Ed. 510, February 1, 1937, p. 16.

Confiscation cannot be justified by beneficent provision for others. The order is contrary to law.

Other features of the order have been debated, but will not be considered, since those referred to are fatal to the order as now drawn.

Appropriate findings and decree will enter in accordance with this opinion and the provisions of the governing statute.