**REDLANDS FOOTHILL GROVES et al. v. JACOBS et al.**

No. 662–Y.

District Court, S. D. California, Central Division.

Jan. 5, 1940.

Ivan G. McDaniel and George C. Lyon, both of Los Angeles, Cal., for plaintiffs.

George A. McNulty, General Counsel, Irving G. Levy, Asst. General Counsel, and John J. Babe, Principal Attorney, all of Washington, D. C., Dorothy Williams, Regional Attorney, of San Francisco, Cal., and James L. Crawford, Asst. U. S. Attorney, of Los Angeles, Cal., for defendants.

YANKWICH, District Judge.

Back of this controversy is what may readily be conceded to be a radical departure in the realm of American Federal governmental activity,—control of working conditions, hours and wages,—by the Federal Government through the power to control interstate commerce, the "Fair Labor Standards Act of 1938," 29 U.S.C.A. § 201 et seq.

Not that this is alien to our civilization.

The integrated economies of the early settlers of the American continent found it imperative to control economic activity.

So we find that in the earliest American criminal code,—that of Sir Thomas Dale, governing the Jamestown settlement in Virginia, (1611)—conditions of trading were regulated. Sales at prices other than those set by the community, the Governor or the Council were punished severely, as was also unauthorized trading with the Indians.

In what was known as the "Cotton Code", which governed New Haven Colony until 1655, we find the following regulations:

"1 Firft it fhall be lawfull for the Governour with one or more of the Counfell, to appoint a reafonable rate of prizes upon all fuch commodities as are out of the Ships, to be bought and fould in the Countrey.

"2 In trucking or trading with the Indians no man fhall give them for any commodity of theirs, Silver or Gold or any weapons of war, either Guns or Gun powder, nor Sword, nor any other munition, which might come to be ufed againft our felves.

"3 To the intent that all oppreffion in buying and felling may be avoyded, it fhall

be lawfull for the Iudges in every Towne, with the confent of the free Burgeffes to appoint certaine felect men, to fet reafonable rates upon all commodities, and proportionably to limmit the wages of workemen and labourers, and the rates agreed upon by them, and ratified by the Iudges, to bind all the Inhabitants of the Towne, The like courfe to be taken by the Governour and Affitants, for the rating of prizes throughout the Countrey, and all to be confirmed if need be by the Generall Court." Ch. V, Cl. 1, 2, and 3 of 1641 Ed., as reprinted in May 1938, Bulletin of the New Haven County Bar Association, p. 74.

But, on the whole, while, through tariffs and subsidies, business activity was encouraged in the United States, conditions of employment of labor,—except in dangerous employments,—were not made the subject of governmental interference.

Even when, at the end of the last century, state interference began, the Federal arm of the Government remained unused.

The wages and hour law, involved in this litigation, is a departure from this,— a departure which the Supreme Court condemned when it was first attempted in an effort to control child labor. Hammer v. Dagenhart, 1918, 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101, 3 A.L.R. 649, Ann.Cas. 1918E, 724.

The departure is indicative of a new realistic approach to the problems of the day. Federal legislation is giving recognition to the relentlessness of facts.

Societies and economic systems do not change precipitately. At times, the change may be unnoticeable. And what may appear to later generations as a revolution may not even be perceptible to those living at the time, and in the midst of the change. But change is of the essence of social life.

What is happening today in human society?

For over a century, from the rise of the industrial system, Western society, including the United States, has been characterized by competition, more or less unrestrained.

The economic thought which dominated it was that of the Manchester school of laissez faire, which taught that economic forces should be allowed free interplay. Order in economic society was supposed to flow from this.

The political thought which dominated it was the doctrine of non-interference of political liberalism. The State (and the word is used here in the sense in which political science uses it, i. e., the coercive force of government) was to interfere as little as possible in the field of economics. Its role was to be that of a policeman, keeping, as it were, the avenues of trade, industry, and commerce open and clear, so that the traffic might flow freely.

The rapid development of industrialism resulted in the concentration of industrial and business activity, with the rapid disappearance of individual units. To the free, independent units, there succeeded a system of interdependence.

The high technological development in the last few decades hastened its full unfoldment.

The development of this social organism has led to the modification of the attitude of State non-interference.

The interest of the general good, the need to equalize opportunities, and to prevent oppression, have led to interference on the part of the State. The State has been called upon to perform broader and wider services. And more functions, heretofore performed by individuals or by private initiative, or not performed at all, have come to be performed by the State. Greater and greater socialization of functions is taking place. The State is becoming an instrument of social welfare, aiming, as a French jurist has put it, á diminuer dans le monde la somme des souffrances injustes. J. Charmont, Les Transformations du droit civil. Avant-propos; See Carroll H. Woody: The Growth of Governmental Function in Recent Social Trends (1933) Vol. II, p. 1274 et seq.; Lyon, Watkins and Abramson, Government and Economic Life, 1939, pp. 441–475; Yankwich, The Constitution and the Future, 1935, pp. 28–30.

This recognition of the need for a greater societal control is behind the statute here involved.

The declaration of policy says:

"(a) The Congress hereby finds that the existence, in industries engaged in commerce or in the production of goods for commerce, of labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers (1) causes commerce and the channels and instrumentalities of commerce to be used to spread and perpetuate such labor conditions among the workers of the several

States; (2) burdens commerce and the free flow of goods in commerce; (3) constitutes an unfair method of competition in commerce; (4) leads to labor disputes burdening and obstructing commerce and the free flow of goods in commerce; and (5) interferes with the orderly and fair marketing of goods in commerce.

"(b) It is hereby declared to be the policy of the Act [chapter], through the exercise by Congress of its power to regulate commerce among the several States, to correct and as rapidly as practicable to eliminate the conditions above referred to in such industries without substantially curtailing employment or earning power." 29 U.S.C.A. § 202.

This is achieved by providing a maximum of hours and the minimum of wages for persons in industry engaged in interstate commerce. The administrative mechanism for carrying out the policy is this: There is created in the Department of Labor a wage and hour division under the direction of an Administrator. His principal office is in the District of Columbia. He and his duly authorized representatives may, however, exercise any of the powers conferred in any place. 29 U.S.C.A. § 204. It is made his duty to appoint a committee for each industry engaged in commerce or in production of goods for commerce. 29 U.S.C.A. § 205(a). Commerce is defined as "trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof." 29 U.S.C.A. § 203(b). The personnel of the Committee is divided equally between disinterested persons representing the public, a similar number of persons representing the employers and a like number of persons representing employees in the industry. 29 U.S.C.A. § 205 (b). To them the Administrator must submit data concerning matters brought before him, 29 U.S.C.A. § 205(d), and convene them, from time to time, for each industry so that they may recommend the minimum rate of wages to be paid. 29 U.S.C.A. § 208 (b). It is the duty of the Committee to recommend the highest wage and the classification necessary without curtailing employment. 29 U.S.C.A. § 208(c). Upon the filing of a report with the Administrator containing its recommendation, the Administrator must give due notice to interested persons giving them the opportunity to be heard. It is the duty of the Administrator to approve and carry into effect the recom-

mendation, if he finds that it is made in accordance with law and is supported by evidence and will effect the purpose of the section. If he disapproves the recommendation, he must resubmit the matter to the Committee for further consideration. 29 U.S.C.A. § 208(d, e).

A person aggrieved by the order of the Administrator may review it in the Circuit Court of Appeals of his residence or the Circuit Court of Appeals for the District of Columbia. 29 U.S.C.A. § 210. Except as to the Child Labor provisions of the law, 29 U.S.C.A. § 212, the Administrator has sole authority to bring actions to restrain violations of the chapter.

The minimum wages are made obligatory, 29 U.S.C.A. § 206, as are also the maximum hours. 29 U.S.C.A. § 207. They, however, apply only to employees "engaged in commerce or in the production of goods for commerce". 29 U.S.C.A. § 207.

By Section 13 of the Act, there are exempt employees employed in agriculture, and those employed within the "area of production" engaged in handling, packing, storing or preparing agricultural commodities for market. 29 U.S.C.A. § 213 (a) (6) and (10).

The claim of the plaintiffs here,—which will be amplified in greater detail later,— is that their establishments are entirely exempt from the provisions as to hours and wages of Sections 6 and 7 of the Act, under Section 13 (a), Clause (6), which exempts agriculture, and Clause (10), which exempts persons engaged in packing fruit within the area of production.

The most fundamental questions before us relate to the circumstances under which courts will interfere by injunctive process with a regulatory law carrying penal provision, for violation of its terms, or of administrative rules promulgated pursuant to it.

So I begin by stating the conditions for the exercise of this extraordinary judicial power.

They are fully stated in Philadelphia Company v. Stimson, 1912, 223 U.S. 605, 620, 621, 32 S.Ct. 340, 344, 56 L.Ed. 570: "A court of equity, said this court in Re Sawyer, 124 U.S. 200, 210, 8 S.Ct. 482, 31 L.Ed. 402, 405, 'has no jurisdiction over the prosecution, the punishment, or the pardon of crimes or misdemeanors. * * * To assume such a jurisdiction, or to sustain a bill in equity to restrain or

relieve against proceedings for the punishment of offenses * * * is to invade the domain of the courts of common law, or of the executive and administrative department of the government.' Harkrader v. Wadley, 172 U.S. 148, 170, 19 S.Ct. 119, 43 L.Ed. 399, 406; Fitts v. McGhee, 172 U.S. 516, 531, 19 S.Ct. 269, 43 L.Ed. 535, 542; 2 Story, Eq.Jur. § 893. But a distinction obtains when it is found to be essential to the protection of the property rights, as to which the jurisdiction of a court of equity has been invoked, that it should restrain the defendant from instituting criminal actions involving the same legal questions. This is illustrated in the decisions of this court in which officers have been enjoined from bringing criminal proceedings to compel obedience to unconstitutional requirements. * * * The validity of the statute is not attacked, because of the assumption that it is not to be construed to contemplate or authorize the alleged deprivation of property. Where the officer is proceeding under an unconstitutional act, its invalidity suffices to show that he is without authority, and it is this absence of lawful power and his abuse of authority in imposing or enforcing, in the name of the state, unwarrantable exactions or restrictions, to the irreparable loss of the complainant, which is the basis of the decree. Ex parte Young, 209 U.S. [123], page 159, 28 S.Ct. 441, 52 L.Ed. [714], 728, 13 L.R.A.(N.S.) 932, 14 Ann.Cas. 764. And a similar injury may be inflicted, and there may exist ground for equitable relief, when an officer, insisting that he has the warrant of the statute, is transcending its bounds, and thus unlawfully assuming to exercise the power of government against the individual owner, is guilty of an invasion of private property."

And see Terrace v. Thompson, 1923, 263 U.S. 197, 216, 44 S.Ct. 15, 68 L.Ed. 255; Hygrade Provision Co. v. Sherman, 1924, 266 U.S. 497, 500, 45 S.Ct. 141, 69 L.Ed. 402; Panama Refining Co. v. Ryan, 1935, 293 U.S. 388, 414, 55 S.Ct. 241, 79 L.Ed. 446; Ickes v. Fox, 1937, 300 U.S. 82, 97, 57 S.Ct. 412, 81 L.Ed. 525; Cerritos Gun Club v. Hall, 9 Cir., 1938, 97 F.2d 620.

▮ Thus, both the exercise of power not authorized and action transcending the bounds of authority may be reached by the court's injunctive interdicts. See Waite v. Macy, 1918, 246 U.S. 606, 38 S.Ct. 395, 62 L.Ed. 892.

▮ The showing of injury must be definite. Spielman Motor Co. v. Dodge, 1935, 295 U.S. 89, 95, 55 S.Ct. 678, 79 L.Ed. 1322. There must be clear and immediate danger or threat of real, not merely apprehended' interference. Northport Power & Light Co. v. Hartley, 1931, 283 U.S. 568, 51 S.Ct. 581, 75 L.Ed. 1275; Richmond Hosiery Mills v. Camp, 5 Cir., 1935, 74 F.2d 200. Mere fears are not enough. First National Bank v. Albright, 1908, 208 U.S. 548, 28 S.Ct. 349, 52 L.Ed. 614; Spielman Motor Co. v. Dodge, supra; Natural Gas Co. v. Slattery, 1937, 302 U.S. 300, 309, 58 S.Ct. 199, 82 L.Ed. 276. Absent a showing of this character, "The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." United States v. Chemical Foundation, 1926, 272 U.S. 1, 15, 47 S.Ct. 1, 6, 72 L.Ed. 131.

Do we have here a situation which calls for judicial interference under these principles?

The action by nine California corporations was originally directed against Harold D. Jacobs, Administrator of the Wage and Hour Division of the Department of Labor of the United States, Philip Fleming, his assistant or aide; Wesley O. Ash, Regional Director; Lawrence A. Peifer, agent for California and Benjamin Harrison, United States Attorney for the Southern District of California.

It has been dismissed against the Administrator and his aide, whose residence is in the District of Columbia. 29 U.S.C.A. § 204(c).

The Complaint is lengthy. It seeks injunctive and declaratory relief against the enforcement of the regulations promulgated by the Administrator under the Act, 29 U.S.C.A. § 201 et seq. The factual background of the acts of which the plaintiffs complain, are these: The Plaintiffs (to whom we shall refer as "associations") are California non-profit cooperative associations formed by their members. They engage in the picking and packing in its raw or natural state of the citrus fruit of their members and employ labor for that purpose. The fruit is picked and packed by the associations as trustees or agents for their members, who are growers who do not individually produce enough to enable them to operate economically their own packing houses, or to compete with individuals or others producing enough

fruit to enable them to operate their own packing houses. By joining together in a cooperative association and using it as their agent for the handling of the fruit, the growers who produce comparatively small quantities of fruit have sufficiently large volume to enable them, through co-operative association, to operate economically a packing house and to compete thereby with larger producers. In order to join in a cooperative association a sufficient number of growers to operate economically a packing house, with proper varieties, of fruits, it is necessary to include growers whose groves are located more than ten miles from the establishment of the association.

In the handling of the fruit by the associations, the identity of each member's fruit is retained and when the fruit is sold, the sales price is returned to him less his proportionate share of the picking and packing charges. The labor employed by the associations is paid for from funds belonging to the member-farmers, and the associations are operated under the direction of directors elected from and by the farmer-members.

The picking and packing of citrus fruit is seasonal in nature. The associations pick and pack Valencia and Navel oranges, grapefruit, and lemons which are produced by their members, and each plaintiff handles more than one variety of fruit. During the peak period of the various seasons of the different kinds and varieties of citrus fruit, it is customary for the regular employees of plaintiffs to work an average of seventy-two hours per week. During the slack periods, there is little available work for these employees, and they average approximately fifteen hours per week. The peak periods for each variety of citrus fruit in each season averages approximately four months in each year.

The Administrator, in his interpretative Bulletin No. 10, has ruled that employees of farmers' cooperative associations are not employees of the farmer, so that such practices are not those performed by a farmer within the meaning of Section 3(f), 29 U.S.C.A. § 203(f), and are not exempt on the basis of the definition of agriculture contained in that section.

The Complaint avers: "Such a ruling is contrary to the facts and the clear intent of the Act. The effect of that ruling, and the regulations defining area of production, is to deny to the small growers who comprise the membership of Plaintiffs' association the right to handle and prepare for market their citrus fruit through establishments collectively owned and operated by them as a cooperative agency, under the same exemption from the provisions of the Act as is given to numerous large growers of citrus fruits in California and Arizona, who, by reason of the heavy volume of fruit which they individually produce, are able to economically operate packing houses at which no fruit save that of their own production is handled such establishments being entirely exempted from Sections 6 and 7 of the Act, under Section 13 (a) (6) of the Act, regardless of the size of the city where such plants are located and regardless of the distance of the groves from said establishments."

After averring that there is, in California citrus industry a definite "area of production", the Complaint challenges the action of the former Administrator, Elmer F. Andrews, in defining "area of production" as called for in Section 13(a) (10) of the Act, 29 U.S.C.A. § 213(a) (10), by a regulation dated October 21, 1938 (Section 563.2), which reads:

"Section 536.2. 'Area of production' as used in Sections (13) (a) (10) of the Fair Labor Standards Act. An individual shall be regarded as employed in the 'area of production' within the meaning of Section 13(a) (10) in handling, packing, storing, * * * preparing in their raw or natural state, or canning of agricultural or horticultural commodities for market * * * (a) if he is engaged in such work on a farm and on agricultural or horticultural commodities produced exclusively on such farm, or

"(b) If the agricultural or horticultural commodities are obtained by the establishment where he is employed from farms in the immediate locality and the number of employees in such establishment does not exceed 7 or. * * *

"(e) With respect to perishable or seasonable fruits and vegetables, if he is engaged in handling, packing, storing, drying, preparing in their raw or natural state, or canning such products for markets in an establishment which is located in the open country or in a rural community and which obtains all of its products from farms in its immediate locality. As used in this subsection (e) 'open country' or 'rural communities' shall not include any city or town of 2500 or greater population ac-

cording to the 15th United States Census, 1930, and 'immediate locality' shall not include any distance of more than ten miles."

The plaintiffs also attack the definition of "area of production" in the regulation dated June 15, 1939, which reads:

"Section 536.2 * * * 'Area of Production' as used in Section 13(a) (10) of the Fair Labor Standards Act. An individual shall be regarded as employed in the 'area of production' within the meaning of Section 13(a) (10), in handling, packing, storing, * * * preparing in their raw or natural state, or canning of agricultural or horticultural commodities for market, * * *.

"(a) If he performs those operations on materials all of which come from farms in the general vicinity of the establishment where he is employed and the number of employees engaged in those operations in that establishment does not exceed 7; or (b) * * *;

"(d) If he performs those operations on materials all of which come from farms in the immediate locality of the establishment where he is employed and the establishment is located in the open country or in a rural community. As used in this subsection (d), 'immediate locality' shall not include any distance of more than ten miles and 'open country' or 'rural community' shall not include any city or town of 2500 or greater population according to the 15th U. S. Census, 1930."

These are asserted to be unreasonable, arbitrary, artificial and discriminatory. The associations now having exhausted all administrative remedies, seek judicial intervention, claiming that the regulation would destroy their business.

The provisions of Section 10 of the Act, 29 U.S.C.A. § 210, establishing a review of the orders of the Administrator issued under Section 8 by the various Circuit Courts of Appeals of the United States and the Circuit Court of Appeals, for the District of Columbia, raises the question whether, in this statute, as in others,—such as the National Labor Relations Act, 29 U.S.C.A. § 151 et seq.,—we are not confronted with a legislative enactment which

has provided an exclusive method of review, which excludes all other judicial intervention. See United States v. Corrick, 1936, 298 U.S. 435, 56 S.Ct. 829, 80 L.Ed. 1263; National Labor Relations Board v. Jones & Laughlin Steel Corp., 1937, 301 U.S. 1, 47, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; Myers v. Bethlehem Shipbuilding Corp., 1938, 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638; Beman v. Bendix Products Corp., 7 Cir., 1937, 89 F.2d 661; Clark v. Lindemann & Hoverson Co., 7 Cir., 1937, 88 F.2d 59; General Motors Corporation v. Bajork, 8 Cir., 1937, 90 F.2d 248; Wilson & Co. v. Gates, 8 Cir., 1937, 90 F.2d 247; Federal Power Commission v. Metropolitan Edison Co., 1938, 304 U.S. 375, 58 S.Ct. 963, 82 L.Ed. 1408; Securities & Exchange Commission v. Andrews, 2 Cir., 1937, 88 F.2d 441; Utah Fuel Co. v. National Bituminous Coal Commission, 1939, 69 App.D.C. 333, 101 F.2d 426; Mallory Coal Company v. National Bituminous Coal Commission, 1938, 69 App.D.C. 166, 99 F.2d 399; see my opinion in Northrop Corporation v. Madden et al., D.C., 30 F.Supp. 993, filed on August 18, 1937.[1]

The Complaint states that the plaintiffs "have pursued to their conclusion all the administrative remedies provided by law". It is not clear whether the reference here is to some general mode of administrative review or to the right to question the Administrator's orders in proceedings before him which the orders themselves reserve to the aggrieved parties. The supporting averments merely show that hearings were had before an Advisory Board of the industry, summoned by the Administrator to advise on matters relating to the area of production.

The Committee recommended a definition of "area of production", to which the plaintiffs and others objected. Hearings were had before the Administrator, who, disregarding both the recommendation of the Committee and the protest of the plaintiffs and others, finally approved the definition of which the Associations complain.

Were this order a part of a wage order issued under Section 8, 29 U.S.C.A. § 208, the failure to seek a judicial review of it under Section 10, 29 U.S.C.A. § 210,

---

[1] The distinction drawn in some of these cases between negative and positive orders of administrative bodies is repudiated by Rochester Telephone Corp. v. United States, 1939, 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147. This does not, however, weaken their authority for the fundamental proposition that provisions for judicial review in legislation of this type are exclusive.

would,—if the remedy therein provided is exclusive,—deprive the plaintiffs of any standing in this court.

However, assume that the remedy is cumulative. Or assume that it is not available to the plaintiffs because they are not complaining of a wage order, but rather of a definition of "area of production" which is independent of the wage order.

Nonetheless, there is no substance to the claim for judicial intervention on the ground of imminent injury to the business of the plaintiffs, in the light of the allegations of the Complaint just epitomized.

Briefly, the grounds for the claim are these:

The associations operate in open and direct competition with over two hundred and seventy-five other citrus packing houses in California and Arizona, sixty per cent of which,—although located within the same area of production, operating in the same manner, and using the same type of labor,—are exempt from all the provisions of the Act.

There are in California and Arizona numerous large growers of citrus fruit in direct and open competition with the associations, who, by reason of the heavy volume of fruit which they produce individually, own and operate packing houses on their own ranches. These also are located within the same "area of production", but are entirely exempt from the provisions of the Act.

The packing of citrus fruit is highly seasonal. The volume of fruit which the associations receive from members depends upon the size of the crop and the maturity of the fruit which, in turn, depends upon climatic conditions. The associations must operate long hours at certain times of the year and, at other times, operate with a small crew for short hours or close down entirely. The periods of seasonal peak activity last for approximately four months for each variety of fruit handled.

The Complaint continues: "Plaintiffs have exhausted, or are about to exhaust, the 14 workweeks' exemption provided by Section 7(c) of the Act. As the 14 workweeks' exemption is used up or exhausted for this calendar year, and for other calendar years to come, it is necessary, in order for Plaintiffs to comply with Sections 6 and 7 of the Act with respect to their employees, to either (1) reduce the operation of their respective packing houses to a workweek not in excess of the maximum hours prescribed in Section 7 of the Act, or (2) confine their present employees to the maximum hours of work each week prescribed in said Section 7 of the Act, and employ additional employees, or (3) continue their present method of operation and pay their employees for all time in excess of said maximum hours and one and one-half times their regular rate of pay."

Under the first alternative, the earnings of the employees would be reduced, their efficiency and morale impaired, and they would likely seek employment elsewhere. The second choice would lead to the employment of unskilled workers. The third would mean an added cost of $5000, for each association.

After stating that compliance with the Act interferes with Order No. 2, issued by the Secretary of Agriculture, under the Agricultural Adjustment Act of 1933, 7 U.S.C.A. § 601 et seq., and relating to the handling of oranges and citrus fruit in interstate commerce (United States v. Edwards, D.C.Calif., 1936, 14 F.Supp. 384; United States v. Edwards, D.C.Calif., 1936, 16 F.Supp. 53; Edwards v. United States, 9 Cir., 1937, 91 F.2d 767), the Complaint states thus the penalties for non-compliance:

"If the Plaintiffs fail or refuse to abide by and act in accordance with the regulation of the Administrator, these Plaintiffs are informed and believe, and upon information and belief allege, that the Defendants intend to enforce against these Plaintiffs the penalties for violation of the Act provided in the Act itself. The Act provides for severe penalties, and it is the duty of the Defendants to enforce the Act and all valid regulations issued thereunder by enforcing these penalties. Administrator Andrews has publicly stated that he believes his definition of 'area of production' is a valid regulation. The present Administrator has just opened an office in Los Angeles, with the announced policy of vigorously enforcing the Act. The Defendants will, unless enjoined therefrom, enforce the Act against these Plaintiffs, and these Plaintiffs will suffer severe penalties. Plaintiffs cannot afford to take the risk of having the drastic and excessive penalties and liabilities provided under the Act imposed upon them, which risk they will take unless the Defendants herein are restrained by this Court from enforcing, or causing to be enforced, against these Plaintiffs, and

others similarly situated, the provisions of Sections 6 and 7 of the Act with respect to their said employees.

"Plaintiffs have no other plain, speedy or adequate remedy at law. The Administrator and the Defendant Benjamin Harrison, as the United States District Attorney, have begun or are about to begin the active enforcement of the Act in the State of California by criminal prosecution and otherwise, and are now free to institute criminal prosecutions and to invoke civil penalties against these Plaintiffs, and each of them. An emergency now exists and confronts these Plaintiffs and others similarly situated."

A second cause of action restates, in substance, the same facts and seeks a declaratory judgment by reason of the controversy arising from the fact that the Administrator asserts the validity of his order and of its application to the plaintiffs, which they deny.

A preliminary injunction is asked.

The three remaining defendants have moved to dismiss.

The lengthy outline of the Complaint given, in its very language, leads to but one conclusion,—namely, that the plaintiffs have not stated a cause for the intervention of a court of equity by way of injunction.

We need not discuss in detail the Administrator's power here exercised to which objection is made.

■ The Congress, in giving the power to define "area of production", did not circumscribe the mode of its exercise.

"To define", when spoken of space, means to set or establish its boundaries authoritatively. See Robert J. Boyd Paving & Contracting Co. v. Ward, 8 Cir., 1898, 85 F. 27, 35.

Webster's New International Dictionary (1937) defines the word: "Define: to mark the limits of; to determine with precision or to exhibit clearly the boundaries of." To "define" means to determine the end or limit, "to fix, or establish the limits". 2 Words and Phrases, First Series page 1944. It is equivalent to "declare, fix, or establish". 1 Words and Phrases, Fourth Series, page 701. It does not presuppose that the boundaries already exist, and that the Administrator must merely find them.

If this were so, then there would be no discretion within the bold outline of Congressional delegated power.

"Seeking out" what exists already is not defining.

■ Nor is a definition which places cooperatives in a different class from similar enterprises organized for profit arbitrary.

There is an inherent distinction between enterprises run for the mutual benefit of a group and the similar ones organized for profit. The ones satisfy mutual needs, irrespective of profits. The others aim chiefly at profit.

The very desire to operate at as low a cost per member as possible may call for regulation and for a different classification. See Bayside Fish Co. v. Gentry, 1936, 297 U.S. 422, 429, 56 S.Ct. 513, 80 L.Ed. 772; Aero Mayflower Transit Co. v. Georgia Public Service Commission, 1935, 295 U.S. 285, 291, 292, 55 S.Ct. 709, 79 L.Ed. 1439; Bradley v. Public Utilities Commission, 1933, 289 U.S. 92, 97, 53 S.Ct. 577, 77 L.Ed. 1053, 85 A.L.R. 1131. Actually, cooperatives have insisted on receiving and have received different treatment from profit organizations.

Thus, they have, throughout our regulatory history, sought and, at times, obtained exemption from restrictions imposed on profit-making ventures engaged in the same field.

Price control, or anti-trust statutes quite often exempt cooperatives or profit-sharing groups. See California Anti-Trust Act, St. Cal.1907, p. 984, amended St.Cal.1909, p. 593. That the exemption may lack constitutional sanction (Cline v. Frink Dairy Co., 1927, 274 U.S. 445, 47 S.Ct. 681, 71 L.Ed. 1146; Blake v. Paramount Pictures, 1938, D.C.Calif.1938, 22 F.Supp. 249) does not alter the fact.

When regulating employment, size has been considered a constitutionally valid criterion for classification.

Thus, hours of labor of women employed in hotels may be regulated without regulating those in the humbler lodging and boarding houses (see In re Miller, 1912, 162 Cal. 687, 698, 699, 124 P. 427; Miller v. Wilson, 1915, 236 U.S. 373, 382–384, 35 S.Ct. 342, 59 L.Ed. 628, L.R.A.1915F, 829) or the hours of women in restaurant employees in cities having a certain population. See Radice v. New York, 1924, 264 U.S. 292, 44 S.Ct. 325, 68 L.Ed. 690.

Size as determined by the number of employees is also a proper criterion. St. Louis Consolidated Coal Co. v. Illinois, 1902, 185

U.S. 203, 22 S.Ct. 616, 46 L.Ed. 872; McLean v. Arkansas, 1909, 211 U.S. 539, 551, 29 S.Ct. 206, 53 L.Ed. 315; Booth v. Indiana, 1915, 237 U.S. 391, 35 S.Ct. 617, 59 L.Ed. 1011; Jeffrey Mfg. Co. v. Blagg, 1915, 235 U.S. 571, 35 S.Ct. 167, 59 L.Ed. 364; Middleton v. Texas Power & Light Co., 1919, 249 U.S. 152, 39 S.Ct. 227, 63 L.Ed. 527. The latest declaration of the Supreme Court on the subject is Carmichael v. Southern Coal & Coke Co., 1937, 301 U.S. 495, 57 S.Ct. 868, 81 L.Ed. 1245, 109 A.L.R. 1327, involving the unemployment compensation Act of Alabama, which applied only to employers who employed eight or more persons for twenty or more weeks in the year.

Mr. Justice Stone thus disposed of the contention of invalidity grounded on the exclusion of employers of less than eight persons: "Distinctions in degree, stated in terms of differences in number, have often been the target of attack, see Booth v. Indiana, 237 U.S. 391, 397, 35 S.Ct. 617, 59 L.Ed. 1011. It is argued here, and it was ruled by the court below, that there can be no reason for a distinction, for purposes of taxation, between those who have only seven employees and those who have eight. Yet, this is the type of distinction which the law is often called upon to make. It is only a difference in numbers which marks the moment when day ends and night begins, when the disabilities of infancy terminate and the status of legal competency is assumed. It separates large incomes which are taxed from the smaller ones which are exempt, as it marks here the difference between the proprietors of larger businesses who and taxed and the proprietors of smaller businesses who are not." Carmichael v. Southern Coal & Coke Co., supra, 301 U.S. at page 501, 57 S.Ct. at page 873, 81 L.Ed. 1245, 109 A.L.R. 1327.

The burdens of the law are varied.

Compliance means the payment of overtime, or the employment of additional persons.

If the definition should be declared invalid, there could be no recovery of wages paid as overtime.

Non-compliance subjects to fine, for the first offense, to fine and imprisonment thereafter, and to civil recoveries amounting to twice the wages and attorneys fees. 29 U.S.C.A. § 216.

■ It may well be that a liberal attitude should impel the conclusion that these penalties, both civil and criminal, and the numerous suits of both natures, to which they might give birth do constitute irreparable injury for which the remedies at law are not adequate. See Jud.Code § 267, 28 U.S.C.A. § 384; Rule 65, Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c; Union Pacific Ry. Co. v. Board of Com'rs of Weld County, 1918, 247 U.S. 282, 287, 38 S.Ct. 510, 62 L.Ed. 1110; Grosjean v. American Press Co., 1936, 297 U.S. 233, 242, 56 S.Ct. 444, 80 L.Ed. 660; American Life Ins. Co. v. Stewart, 1937, 300 U.S. 203, 214, 215, 57 S.Ct. 377, 81 L.Ed. 605, 111 A.L.R. 1268; Terry v. New York Life Ins. Co., 8 Cir., 1939, 104 F.2d 498, 501.

However, the injury contemplated must be real, not fancied, actual not prospective, threatened not imagined.

■ The Act defines "agriculture" to include: "farming in all its branches and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities (including commodities defined as agricultural commodities in section 1141j (g) of Title 12, as amended), the raising of livestock, bees, fur-bearing animals, or poultry, and any practices (including any forestry or lumbering operations) performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market." 29 U.S.C.A. § 203(f).

Exempt also from the provisions of the Act are those "engaged in the first processing of, or in canning or packing, perishable or seasonal fresh fruits or vegetables, or in the first processing, within the area of production (as defined by the Administrator), of any agricultural or horticultural commodity during seasonal operations, or in handling, slaughtering, or dressing poultry or livestock, the provisions of subsection (a), during a period or periods of not more than fourteen work weeks in the aggregate in any calendar year, shall not apply to his employees in any place of employment where he is so engaged." 29 U.S.C.A. § 207(c).

Cooperative packing carried on as a separate business enterprise for the benefit of a group of farmers may not be, strictly speaking, agriculture as defined by the

Act. A process in the marketing of fruit may, if carried on in continuity by a farmer, be a part of the chain of events leading to the preparation of the farm products for the market. Yet if one step in that process, such as packing, be carried on not by the individual farmer, but by others for him, as a process separate and apart from the farming operations and at a distance from them, we are dealing with an enterprise which, while helpful, is not an incident to the individual farming operations of the members of the association. And, therefore, not, strictly speaking, agriculture. If a farmer should gather honey on his farm and bottle it, the bottling might be considered a part of the process of apiculture. But if many farmers should associate and, at a distance from their farms, establish a cooperative enterprise for the bottling of the honey, that enterprise would acquire a distinct entity.

But if this provision does not exempt them, clearly the associations are exempt under Section 7(c) of the Act as being engaged in the processing of perishable fruit,—if the allegations of the Complaint are taken at their face value.

The obligation to pay the overtime wages under Section 7(a) does not exist if the exemption under Section 7(c) is adequate.

Further exemption under Section 13(a) (6) and 13(a)(10) could not better the position of the associations if, in fact, they are operating within the law.

And this brings us to what is, perhaps, the nub of the matter and the chief weakness of the claim here.

■ While the Complaint expresses fear that the overtime limit set in Section 7(c) may be reached, there is no allegation that it has been reached. So far, none of the plaintiffs has violated the order of the Administrator. Nor has there been any direct threat by any of the defendants before the court to use any coercive action against them to compel compliance.

There is, therefore, no showing of immediate danger to the enterprise of the plaintiffs which calls for the intervention of a court of equity through injunctive process.

■ Equity will not assume jurisdiction unless the threat is imminent. See Boise Artesian Hot & Cold Water Co. v. Boise

City, 1909, 213 U.S. 276, 285, 29 S.Ct. 426, 53 L.Ed. 796; Massachusetts v. Mellon, 1923, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078; New Jersey v. Sargent, 1926, 269 U.S. 328, 46 S.Ct. 122, 70 L.Ed. 289; Arizona v. California, 1931, 283 U. S. 423, 51 S.Ct. 522, 75 L.Ed. 1154; Nashville, C. & St. L. Ry. Co. v. Wallace, 1932, 288 U.S. 249, 261-263, 53 S.Ct. 345, 77 L.Ed. 730, 87 A.L.R. 1191; United States v. West Virginia, 1935, 295 U.S. 463, 55 S.Ct. 789, 79 L.Ed. 1546; Sparks v. Mellwood Dairy, 6 Cir., 1934, 74 F.2d 695.

The authority of the Administrator is not denied. Nor is his power to define "area of production." The associations do not claim that they are not engaged in interstate commerce.

■ The chief claim of exemption is grounded on Clause (a)(10) of Section 13 of the Act which reads: "Section 13 [§ 213] (a). The provisions of sections 6 [206] and 7 [207] shall not apply with respect to * * * (6) any employee employed in agriculture; * * * or (10) to any individual employed within the area of production (as defined by the Administrator), engaged in handling, packing, storing, * * * preparing in their raw or natural state, * * * of agricultural or horticultural commodities for market * * *." 29 U.S.C.A. § 213(a) (6) (10).

At best, the position in which the plaintiffs find themselves is difficult.

Assuming that the Administrator's definition of "area of production" is wrong, they cannot claim exemption under it unless the Administrator redefines the phrase so as to exclude their establishments.

As power is given to him only, no court process could compel action.

Courts cannot control the exercise of official discretion. Proctor & Gamble v. United States, 1912, 225 U.S. 282, 297-300, 32 S.Ct. 761, 56 L.Ed. 1091; Adams v. Nagle, 1938, 303 U.S. 532, 543, 58 S.Ct. 687, 82 L.Ed. 999; Hegeman Farms Corp. v. Baldwin, 1934, 293 U.S. 163, 55 S.Ct. 7, 79 L.Ed. 259; Shields v. Utah Idaho Central Ry. Co., 1938, 305 U.S. 177, 181, 59 S.Ct. 160, 83 L.Ed. 111, et seq. So, even if the present action of the Administrator were annulled, it would not benefit the plaintiffs.

As it is, they have failed to show aught but fear of coercive action to compel compliance. This does not suffice.[2]

If the action cannot be entertained as a suit for injunction, may relief be granted by way of Declaratory Judgment?

The Declaratory Judgments statute, 28 U.S.C.A. § 400, has not widened the jurisdiction of the District Courts. Southern Pacific Co. v. McAdoo, 9 Cir.; 1936, 82 F.2d 121; United States v. West Virginia, 1935, 295 U.S. 463, 55 S.Ct. 789, 79 L.Ed. 1546. Courts have refused to give relief under it when there was not an actual threat of injury, but merely a fear or apprehension of damages. Ashwander v. Tennessee Valley Authority, 1936, 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688; Bradley Lumber Co. v. National Labor Relations Board, 5 Cir., 1936, 84 F.2d 97; Borchard on Declaratory Judgments, 1934, pp. 36–40; 1 C.J.S., Actions, § 18, subd. 9, pages 1030, 1031.

In Bettis v. Patterson-Ballagh Corp., D.C., 1936, 16 F.Supp. 455, I expressed my adherence to this principle and applied it.

However, "a declaration of non-liability is within the ambit of justiciability." Maryland Casualty Co. v. Hubbard, D.C.Cal., 1938, 22 F.Supp. 697, 699; and see Borchard's Comment, 1939, 34 Illinois Law Review, 245.

In principle, nothing stands in the way of applying the norm to the relationship between a citizen and governmental authority. Years ago, I called attention to cases like State ex rel v. Grove, 1921, 109 Kan. 619, 201 P. 82, 86, 19 A.L.R. 1116, in which a declaratory judgment statute was used by a state to determine the eligibility of a person to fill an office in the face of a city penal ordinance prohibiting the employee of a railroad operating a franchise granted by a city or having a contract with it from holding any office.

This was done before the official actually assumed office. Yankwich, Judicial Power and Declaratory Relief, 1936, 3 The New Pacific Law Journal, 166. The Court in sustaining the use of declaratory judgment said: "There is a present controversy between the parties, the defendant claiming the right to perform the duties of the office to which he has been elected, and the plaintiff denying that right. The controversy is actual, not moot; concrete, not abstract. An interpretation of the statute concerning ineligibility is not the ultimate object of the suit, but is a necessary step in determining whether the defendant is entitled to act as city commissioner. That question under the ordinary procedure could only be judicially decided after the defendant had assumed the duties of the office, thereby exposing himself to punishment by both fine and imprisonment. Even if injunction would lie to prevent his acceptance of the office, such relief would be unnecessary. In the remote contingency of his desiring to occupy the office after his ineligibility had been determined, the statutory penalty would exercise a sufficient restraining influence. The decision when announced is not merely advisory. It is a final adjudication having the binding force of any other judgment. If after its being adjudged that the defendant is disqualified he should undertake to hold the office, and the state should bring a proceeding to oust him, the only matter open to inquiry would be whether he was actually holding it; he could not be heard to raise any issue of either law or fact going to the question of his eligibility, and this results from the principle of res judicata, and not from that of stare decisis." See Quinones v. Landron, 1 Cir., 1938, 99 F.2d 618.

There are more recent instances of the use of this form of relief, to determine the legality of one's conduct of a business before incurring the penalties of violation of

---

[2] We have purposely omitted any reference to the elaborate affidavits filed by both sides. Although material on the request for injunction, they have no bearing on the motion to dismiss. It must be determined solely on the averments of the Complaint.

This procedure, which the plaintiffs urged strongly in their final brief, gives the fullest scope to the facts pleaded in the Complaint. It reduces the problem to one of law, as the averments of the Complaint must be taken as true for

the purpose of the motion to dismiss. Payne v. Central Pacific Ry. Co., 1920, 255 U.S. 228, 232, 41 S.Ct. 314, 65 L.Ed. 598; Street v. Lincoln Safe Deposit Co., 1920, 254 U.S. 88, 89, 41 S.Ct. 31, 65 L.Ed. 151, 10 A.L.R. 1548; Chester Fosgate Co. v. Kirkland, D.C.Fla., 1937, 19 F.Supp. 152, 156.

Thus, the conclusion reached is based not on a choice of facts, but on the application of legal principles to undisputed facts.

law. See Multnomah County Fair Ass'n v. Langley, 1932, 140 Or. 172, 13 P.2d 354; Utah State Fair Ass'n v. Green, 1926, 68 Utah 251, 249 P. 1016; Chung Mee Restaurant v. Healy, 1934, 86 N.H. 483, 171 A. 263; Morris v. Ellis, 1936, 221 Wis. 307, 266 N.W. 921; Sandelin v. Collins, 1934, 1 Cal.2d 147, 33 P.2d 1009, 93 A.L.R. 956.

Borchard has defended the use of declaratory judgment under such circumstances: "Petitioners frequently claim that the conduct of their business is outside the restrictions of a criminal statute and that they are not subject to its terms, as the plaintiff construes the statute. Why is this not a legitimate use of the declaratory action? With a criminal penalty attached to so many administrative orders and ordinances, businessmen necessarily are often thrown into uncertainty as to whether their conduct does or does not violate a criminal law. If charged with crime but not actually prosecuted, why is it not appropriate for them to raise the issue of statutory construction in a civil suit, rather than await the pleasure of the District Attorney, who may never begin his suit? Must they remain indefinitely under a suspended sword of Damocles? The suggestion that equity will not restrain the prosecution of a crime is beside the point, for no prosecution is, by hypothesis, in early prospect. There has been only an unexecuted threat. The businessman would seem then to be in a position to challenge the validity of a claim of public officials that his business is conducted in violation of law. Moreover, by assuming the initiative he relieves prosecuting officials of the burden of proving the violation beyond a reasonable doubt. On the contrary, he assumes the special burden of proving his own immunity by a preponderance of evidence. Such a transfer of the issue of statutory construction or interpretation from the criminal to the civil courts ought certainly to be approved when the District Attorney himself desires that the method of adjudication. To suggest that there is only one method of trying the validity and legitimacy of a business practice seems too narrow a view of the judicial function." Borchard, Declaratory Judgments 1939, 9 Brooklyn Law Review, 1, 24.

■ I agree with this view. I can conceive of no good reason for not relieving a citizen of a threat of official action resulting from his relation to a governmental agency.

A declaration of non-liability as applied to such a relationship is, if at all, more important in these days of expansion of governmental frontiers, than a similar declaration as to contractual relations.

■ As said by the Supreme Court of Alabama in Scott v. Alabama State Bridge Corporation, 1936, 233 Ala. 12, 17, 169 So. 273, 277: "Controversies touching the legality of the acts of public officials, or public agencies, challenged by parties whose interests are adversely affected, are one of the favored fields for such declaratory judgment, styled in the act and in the authorities, the 'declaration.' Official action, done or threatened, challenged as unlawful, a usurpation of official power, whether lack of authority appears in the terms of the statutes, or because of unconstitutionality thereof, are said to be determinable in this manner rather than force the parties to seek injunctive relief, which involves many questions going to the propriety of such relief." And see Nashville, C. & St. Louis Ry. Co. v. Wallace, 1933, 288 U.S. 249, 263, 53 S.Ct. 345, 77 L.Ed. 730, 87 A.L.R. 1191.

■ However, as Borchard says (op. Cit. p. 47), "the defendants' acts must * * * constitute a genuine threat". And a declaration should not be made unless it will serve a useful, practical purpose. The discretionary power of the court should not be exercised when no beneficial result could follow. See Aetna Casualty & Surety Co. v. Quarles, 4 Cir., 1937, 92 F.2d 321, 325; Aetna Casualty & Surety Co. v. Yeatts, 4 Cir., 1938, 99 F.2d 665, 669.

In this case, there is a basic principle which precludes effective relief by way of injunction or otherwise.

The official residence of the Administrator and the Assistant Administrator is the District of Columbia. 28 U.S.C.A. § 112. They cannot and have not consented to be sued here. On the contrary, they moved to dismiss the Complaint upon that ground, and the motion was granted, without opposition.

Can we reach them through their subalterns?

There is no showing in the Complaint that the subalterns, Wesley O. Ash, Regional Director of the Sixteenth Region of the Wage and Hour Division of the United States Department of Labor, Lawrence A. Peifer, Inspector of the Wage and Hour Division of the United

States Department of Labor, or Benjamin Harrison, United States Attorney for the Southern District of California, or any of them, have the authority to institute proceedings against the plaintiffs or anyone else for violations of the order of the Administrator. The power is specifically denied by each of them in affidavits. Nor is it given to them by the Act, which subjects all litigation to the direction and control of the Attorney General. 29 U.S.CA. § 204(b).

But, even if the showing were adequate, we would be powerless to enjoin them or to make a declaration that would help the plaintiffs. The principle that heads of governmental departments, exercising discretionary powers, cannot be reached, indirectly, through subalterns, stands in the way.

I had occasion very recently to dwell on the seemingly unsatisfactory state of the law on the subject. Eastman v. United States, D.C.Wash.,1939, 28 F.Supp. 807, 809.

There, I followed the one definite clue to interference with the head of a governmental department by action against his subalterns,—i. e., when the power to act does not exist at all.

Here, the power of the administrator to define the area of production is not questioned. And it could not well be. For the Act gives it to him specifically.

And the associations' very claim to exemption rests on a definition to be made by the Administrator which would exempt them. The harm complained of flows not from the power but from the mode of its exercise. This is abuse of power.

And such abuse cannot be challenged except in a proceeding to which the head of the department is a party. As said in Warner Valley Stock Co. v. Smith, 1896, 165 U.S. 28, 34, 17 S.Ct. 225, 228, 41 L. Ed. 621: "The purpose of the bill was to control the action of the secretary of the interior. The principal relief sought was against him; and the relief asked against the commissioner of the general land office was only incidental, and by way

of restraining him from executing the orders of his official head. To maintain such a bill against the subordinate officer alone, without joining his superior, whose acts are alleged to have been unlawful, would be contrary to settled rules of equity pleading". And see Gnerich v. Rutter, 1924, 265 U.S. 388, 44 S.Ct. 532, 68 L.Ed. 1068; Alcohol Warehouse Corp. v. Canfield, 2 Cir., 1926, 11 F.2d 214; Moody v. Johnston, 9 Cir., 1934, 70 F.2d 835; National Conference on Legalizing Lotteries, Inc., v. Goldman, 2 Cir., 1936, 85 F.2d 66; Jewel Productions, Inc., v. Morgenthau, 2 Cir., 1938, 100 F.2d 390.[3]

The Administrator is an indispensable party. His absence precludes any relief. Rule 10, Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c; State of Washington v. United States, 9 Cir., 1936, 87 F.2d 421.

Non-joinder is no longer a ground of dismissal. Rules 7 and 21, Federal Rules of Civil Procedure.

But where no relief could be granted against the parties before the court, the complaint must fail for failure to state a claim for relief. Rule 12(b), Federal Rules of Civil Procedure.

Here, we could not, through any judgment against the subalterns, affect the Administrator's determination of the facts of which the plaintiffs complain or make a contrary determination which would be binding on the Administrator, who is not before the court, or which would be helpful to the plaintiffs in their relationship with the wage and hour administration. See: Bradley Lumber Co. v. National Labor Relations Board, 5 Cir., 1936, 84 F.2d 97; State of Washington v. United States, supra; and see Bethlehem Shipbuilding Co. v. Nylander, D.C.Calif., 1936, 14 F. Supp. 201.

Hence our discretionary power should be exercised against it.

These conclusions would justify the granting of the motions to dismiss without leave to amend.

However, as the plaintiffs have asked specifically that they be granted such leave, it should not be denied to them.

[3] Berdie v. Kurtz, 9 Cir., 1935, 75 F. 2d 898, on which plaintiffs rely, does not conflict with the view taken here. It accords with my ruling in Eastman v. United States, D.C.Wash., 1939, 28 F. Supp. 807, 809. The majority considered, as I did, the acts of the subordinates there complained of to "constitute trespass." See opinion, 75 F.2d page 905. There is no threatened trespass here.

The motions to dismiss will, therefore, be granted and a preliminary injunction will be denied, with leave to amend within twenty days.