**1146**

C. LEONARDT IMPROVEMENT CO., a Nevada corporation; Southwestern Cement Associates, a California corporation; Southwestern Portland Cement Company, a West Virginia corporation; Felix X. McGinnis, Jr. and Carl L. McGinnis, individually and on behalf of certain stockholders of plaintiff C. Leonardt Improvement Co., a Nevada corporation; Walter D. Hege, individually and on behalf of the minority stockholders of Southwestern Cement Associates, a California corporation; Robert H. Fielding, individually and on behalf of the minority stockholders of Southwestern Portland Cement Company, a West Virginia corporation, Plaintiffs,

v.

SOUTHDOWN, INC., a Louisiana corporation, et al., Defendants.

Civ. No. 69–2563.

United States District Court,
C. D. California.

Feb. 9, 1970.

Overton, Lyman & Prince, Carl J. Schuck, Wayne H. Knight, Ernest E. Johnson, Los Angeles, Cal., for certain plaintiffs.

William I. Edlund, Pillsbury, Madison & Sutro, San Francisco, Cal., Lawrence T. Lydick, Adams, Duque & Hazeltine, Los Angeles, Cal., for Southdown, Inc.

Lynn D. Crandall, Crandall & Whitesell, Los Angeles, Cal., for Gloria Powell, Edward W. Austin, William P. Brophy, Jr.

J. Philip Nevins, Lawler, Felix & Hall, Los Angeles, Cal., for Security Pac. Nat. Bank.

Joseph Thompson, Beverly Hills, Cal., for Union Bank, Jane T. Powell and Guardian of Estates of Robert A. Brophy, Michael F. Brophy, Amy F. Brophy, Mary Ann Brophy and Nancy T. Brophy.

McCutchen, Doyle, Brown & Enersen, Albert J. Moorman, San Francisco, Cal., for The Fund American Retirement Plan and the Board of Trustees of the Leland Stanford, Junior University.

## ORDER DENYING PRELIMINARY INJUNCTION

WILLIAMS, District Judge.

This action involves the take-over attempts of a closely-held family corporate enterprise by Southdown, Inc., a conglomerate. The target company C. Leonardt Improvement Co., (CLI) has filed its complaint alleging that Southdown and certain CLI stockholders conspired together to defraud other stockholders of CLI by selling control to Southdown; that Gloria Powell, one of CLI's directors, breached her fiduciary relationship by delivering certain confidential corporate data to Southdown which aided the latter to formulate its stock offer; that Southdown gave Powell and Edward W. Austin, her agent, certain favored treatment to entice her to sell it her shares, which amounted to 4.54% of CLI; that it gave certain selling stockholders the option of receiving $12,600.00 cash for each share or an equivalent sum represented by the subordinated convertible note of the buyer; whereas this option to receive cash was not made to plaintiffs who constituted minority stockholders. The complaint further alleges violations of the anti-fraud provisions of Federal and California Securities Laws and charges that for the Court to allow the takeover would be to permit a violation of Sec. 7 of the Clayton Act since Southdown's acquisition of stock in CLI might result in the practice of "reciprocity", and might tend to lessen competition in the cement industry. Of present concern is plaintiff's urgent demand for a preliminary injunction enjoining Southdown from acquiring additional CLI shares or soliciting proxies, and sterilizing its present holdings, which now amounts to 59.39%.

C. Leonardt Improvement Co. was organized in 1923 in Nevada. Its founder was the grandfather or great grandfather of most of the present individual stockholders. He organized Southwestern Cement Associates (Associates) in 1927 and still later Southwestern Portland Cement Company (Southwestern) came into the corporate fold. CLI, as of November, 1969, had 61 stockholders including trusts, guardianships, and nominees. The stock of Associates is held by 59 stockholders. 80% of the stock of Associates is owned by CLI. Southwestern is engaged in the manufacture and sale of cement in California and other parts of the United States. As of the November date its common stock was held by 127 individuals and its preferred by 121 individuals. The chief stockholder of Southwestern is Associates which held 54.7% of its common stock and 40.8% of its preferred.

Management of these companies has always been restricted to family members and the track record is good. Felix S. McGinnis Jr. and Carl L. McGinnis, grandsons of the founder, have directed the affairs of the company through a five-man board which included Gloria Powell, their cousin, a dissident. CLI has a net worth of approximately $35,000,000.00 with few liabilities. It has paid its stockholders high dividends for many years and is an attractive holding. Notwithstanding this, certain of the individual stockholders, and especially Gloria Powell who is in great financial distress, felt that they were in a "locked in" position and that the closely-held characteristic was a factor that limited liquidity and they urged the McGinnis faction to offer the company to a conglomerate-type so they might receive for their shares the share of the buying company which would be more marketable.

Felix and Carl McGinnis did actually entertain several proposals during 1969 but in the end advised against accepting any of the various offers because they felt that to do so was not in the best interests of the stockholders. Certain stockholders have accused them of turning the proposals down for personal reasons, not connected with or for the benefit of other stockholders.

Gloria Powell's financial predicament became so acute that Edward Austin, her advisor and agent, actively sought out Southdown and interested that company in purchasing shares of CLI. Aus-

tin is accused by plaintiffs of also being instrumental in getting other family groups of stockholders to express a willingness to sell their shares to Southdown too. An officer of Southdown called upon the McGinnis brothers approximately September 16, 1969 and told them of his company's interest in CLI but got no encouragement. He did, however, ask for and obtain permission from Messrs. McGinnis to discuss the offer with other stockholders, and the result of those discussions soon led to 59% of other stockholders signing a Stock Purchase Agreement with Southdown. These selling stockholders insist that each acted independently of the other; that they were fully informed and not misinformed on all facets of the sale by the seller; that they each are knowledgeable and sophisticated investors and were each represented by expert advisers and counsel; that each sold in order to attain investment goals peculiar only to himself and that none of them acted in concert with a purpose to sell "control" of CLI.

To the contrary, plaintiffs claim that Southdown contemplates a complete takeover of CLI so that it may seize its cash and other liquid assets and then engage in antitrust violations by "reciprocal dealing" and that the result will be to lessen competition in the cement industry. Supporting this, plaintiffs point to the fact that Southdown is partly owned by defendant Zapata which among other things is engaged in heavy construction business in Southern California through its ownership of subsidiaries including Diversified Builders Inc. (DBI) and that if the sale of CLI to Southdown is allowed, Zapata will be the owner of Southwestern, a major manufacturer of cement, and will also be the owner of DBI, a major purchaser of concrete, the end product of cement, both being located in Southern California.

This case calls for a careful and considerate balancing of equities. If the preliminary injunction is granted the McGinnises will continue managing the company pending trial, and its policy of declaring sizeable dividends will be maintained and a general status quo will prevail. The selling stockholders, however, would be displeased because Southdown may very well rescind its agreement to purchase their shares and leave them in what the sellers consider a "locked in" position. If injunction is denied, Southdown will in all likelihood vote its shares to replace present management; there is little doubt that it will carry out its declared policy of ceasing dividend payments and the fluid assets of the target company might well be channeled into areas abhorrent to present management. Also the McGinnis group would then take on the "locked in" characterization and possibly have to sell to disadvantage.

 The prudent exercise of judicial discretion is most certainly called for in a situation as this where each side has important stakes and passionately urges its point of view. I have only come to feel that the relief requested must be denied after carefully weighing all the factors involved.

 The granting or withholding of a preliminary injunction rests in the sound discretion of the court. "The grant * * * is the exercise of a very far reaching power never to be indulged in except in a case clearly warranting it." Dymo Industries, Inc. v. Tapeprinter, Inc., 326 F.2d 141 (9th Cir. 1964). It is an extraordinary remedy, and will not be granted except upon a clear showing of probable success upon a trial and possible irreparable injury. Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319, 323 (2d Cir. 1969). A review of the hardships and equities does not disclose a balance favoring injunctive relief. Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 743 (2d Cir. 1953).

I am not called upon at this time to reach final conclusions as to the various charges by plaintiffs of antifraud and antitrust violations, and I do not attempt to do so from the present record. I must, however, be convinced with reasonable certainty that the moving party

will succeed at the trial of the action before a preliminary injunction should issue, and I do not possess that assurance. Moreover, if plaintiffs should present a stronger record at the trial on the merits and thus prevail, their losses could easily be measured and recompensed.

## SECURITY FRAUD ALLEGATIONS

To support its anti-fraud allegations plaintiffs argue that Southdown gave a premium to Powell and a finders fee to Austin, her agent, in order to start the campaign which eventually led to its majority acquisition. Further, that by means of secrecy, non-disclosure and misrepresentation, Southdown, aided by Powell and Austin illegally hoodwinked the remaining sellers to part with their shares. Whether Powell received favored treatment, the like of which is frowned upon by the law, will certainly be the subject of much controversy at the trial, as will be the accusation that the remaining sellers were taken advantage of. It is to be noted, however, that all the sellers are experienced investors and were well-represented by advisors during the negotiations that led to their sales of shares and all have appeared in this proceeding by affidavit or otherwise, and indicated their continuing satisfaction with the deal they got and they stoutly deny that any advantage was taken of them. In addition, they contend that each negotiated independently and sold for his own reasons. In the light of this early look at plaintiffs' anti-fraud charges there is a great want of proof.

## ANTITRUST ALLEGATIONS

Defendants argue that all the present charges except the antitrust allegations were litigated in the Los Angeles Superior Court and before the California Corporations Commissioner and decided adversely to present plaintiffs; that after such rulings against it, plaintiffs added antitrust charges to its complaint and

that this was little more than a desperate last minute effort to stave off the takeover. In this connection it is to be noted that during the mid year 1969, negotiations the McGinnis brothers conducted with Gulf + Western Industries and National Gypsum Company would have posed similar Sec. 7 problems.

Answering plaintiff's reciprocal dealing fears, defendant Southdown denies any such plans, denies having ever engaged in such activities and alleges it has a strong corporate policy denouncing it. Replying to plaintiff's charge that Zapata subsidiary DBI would buy all its concrete from the target company and thus somehow lessen competition in this industry, defendants say that the bulky nature of the product calls for it being purchased as near the construction site as possible; that it has always been interested in purchasing with an eye on economy and that in any event, plaintiffs have failed to show that a substantial share of the market would be affected. Defendant's chart shows that since 1964 BDI's highest year in cement purchase in Southern California was 1968 and that during that year, it purchased only $^{47}/_{100}$ths of one per cent of total cement used. This de minimis figure goes little distance in affecting the total market.

For there to be justification for the issuance of a preliminary injunction to prevent antitrust violations the plaintiff must show that such is necessary to prevent irreparable injury (Meiselman v. Paramount Film Distributing Corp., 180 F.2d 94, 97 (4th Cir. 1950) and as Judge Yankwich puts it the "injury contemplated must be real, not fancied, actual not prospective, threatened not imagined." Redlands Foothill Groves v. Jacobs, 30 F.Supp. 995, 1005 (S.D.Cal. 1940). There has been an insufficient showing in this case to warrant equitable interference. (cf. Allis-Chalmers Manufacturing Co. v. White Consolidated Industries, Inc., 414 F.2d 506 (3rd Cir. 1969).